#27557-a-DG
**2016 S.D. 90**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

CARLYLE SCHLIEM and
FARMERS STATE BANK OF CANTON,                    Plaintiffs and Appellants,


            v.


STATE OF SOUTH DAKOTA,
by and through the Department
of Transportation and the South Dakota
Transportation Commission,                       Defendants and Appellees.


* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE LAWRENCE E. LONG
Judge

* * * *

MARK V. MEIERHENRY
CLINT SARGENT
CHRISTOPHER HEALY of
Meierhenry Sargent, LLP
Sioux Falls, South Dakota


        and


LARRY A. NELSON of
Frieberg, Nelson & Ask, LLP
Canton, South Dakota                             Attorneys for plaintiffs
                                                 and appellants.


KARLA L. ENGLE
Special Assistant Attorney General
Department of Transportation
 Office of Legal Counsel
Pierre, South Dakota                             Attorneys for defendants
                                                 and appellees.


* * * *

ARGUED ON APRIL 26, 2016
OPINION FILED **12/07/16**

#27557

GILBERTSON, Chief Justice

[¶1.] Carlyle Schliem and Farmers State Bank of Canton (the Bank) brought an inverse-condemnation action against the State in connection with the State's reconstruction of the interchange between Interstate 90 and Cliff Avenue in Sioux Falls. Schliem argues the State's closure of a nearby intersection diminished the market value of his property. The circuit court granted summary judgment in favor of the State, and Schliem and the Bank appeal. We affirm.

## Facts and Procedural History

[¶2.] Schliem owns, and the Bank holds a mortgage on, Lots 13 and 14 in the North Side Gardens Addition to the City of Sioux Falls (the Property). The Property is located on the south side of 63rd Street North, approximately 748 feet east of 63rd Street's intersection with Cliff Avenue (the Intersection). The Intersection was located approximately 66 feet south of Interstate 90's eastbound on-ramp. The Property abuts 63rd Street to the north and Wayland Avenue to the east.[1] Schliem, who has owned the Property for approximately 25 years, and the owners of several other properties in North Side Gardens intended to commercially develop the area around the anticipated site of a new hotel.

---

1. Wayland Avenue is a 17-foot-wide dirt road that is sometimes impassable. Because it is not currently suitable for traffic, we disregard its presence for the purposes of this appeal.



[¶3.]        In 2013 and 2014, the State reconstructed a portion of Interstate 90 and Cliff Avenue.  As part of the project, the State closed the Intersection because it interfered with efficient traffic movements on Cliff Avenue and the on-ramp to Interstate 90.  Before the State's project, 63rd Street terminated in a dead end approximately 1,282 feet east of Cliff Avenue.  Approximately 300 feet east of this dead end, a separate segment of 63rd Street intersected with National Avenue and continued east toward Gulby Avenue.  Prior to closing the Intersection, the State eliminated this 300-foot gap by installing an asphalt road connecting the two segments of 63rd Street.  The result is that the driving distance between the

Property and the nearest intersecting highway is approximately 86 feet more than before the State's project.[2]

[¶4.]　　　As part of the project, the State purchased Lots 2, 3, 4, 16, 17, and a portion of 18. The State condemned a small, triangular strip of land across the northern border of Lots 6, 7, and 8.[3] It also took the right to directly access Cliff Avenue from abutting Lot 19.[4] The State did not take or purchase any property interest belonging to Schliem.

[¶5.]　　　Even so, Schliem brought an action against the State alleging inverse condemnation and a violation of due process. To support his claims, Schliem produced evidence that the market value of the Property decreased from $464,800 to $151,000 after the Intersection's closure. In response, the State asked the circuit court to dismiss Schliem's action for failure to state a claim. After a hearing, the court converted the State's motion to dismiss into a motion for summary judgment. Schliem then also asked for summary judgment, and the circuit court held a hearing to consider the competing motions. Concluding that Schliem had not

---

2.　　In its memorandum decision, the circuit court stated that the distance from Cliff Avenue to Schliem's property is approximately 748 feet, that the distance from Cliff Avenue to 63rd Street's preconstruction dead end was approximately 1,282 feet, and that 63rd Street resumed and intersected with National Avenue and Gulby Avenue 300 feet to the east of its preconstruction dead end. Thus, Schliem's property is only 534 feet away from the 300-foot, asphalt extension of 63rd Street, and he must travel approximately 834 feet to the east to reach the nearest intersecting highway.

3.　　This taking is the subject of *State v. Miller & Walsh*, 2016 S.D. 88, ___ N.W.2d ___.

4.　　This taking is the subject of *State v. JB Enterprises, Inc.*, 2016 S.D. 89, ___ N.W.2d ___.

identified a property interest that had been taken or damaged by the State, the court granted the State's motion.

[¶6.] On appeal, Schliem raises the following issue: Whether the circuit court erred in granting the State's motion for summary judgment.

**Standard of Review**

[¶7.] "In reviewing a grant or a denial of summary judgment under SDCL 15-6-56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law." *Gades v. Meyer Modernizing Co.*, 2015 S.D. 42, ¶ 7, 865 N.W.2d 155, 157-58 (quoting *Peters v. Great W. Bank, Inc.*, 2015 S.D. 4, ¶ 5, 859 N.W.2d 618, 621). "We view the evidence 'most favorably to the nonmoving party and resolve reasonable doubts against the moving party.'" *Id.* ¶ 7, 865 N.W.2d at 158 (quoting *Peters*, 2015 S.D. 4, ¶ 5, 859 N.W.2d at 621).

**Analysis and Decision**

[¶8.] Schliem argues that he has a property right in direct access to the Intersection and that by closing the Intersection, "the State's project destroyed 100% of the commercial accessibility" to the Property. According to Schliem, this loss of commercial accessibility diminished the market value of the Property by $313,800. Concluding that Schliem had failed to identify a property right that had been taken or damaged by the State, the circuit court noted: "It is perhaps true that the value of the Property has been diminished as the result of the Project, but I find that such diminishment in value, standing alone, is insufficient to qualify as 'damage' sufficient to allow compensation to be awarded from [the State]." Schliem

claims that "[t]his statement by the trial court which finds the necessary elements proving the State liable for a constitutional damaging is simply an error of law." Schliem is incorrect.

[¶9.]     Before addressing the legal question whether the State was entitled to judgment on the merits, we begin by examining whether there are any genuine issues of material fact in this case.  According to Schliem, "[t]here are facts in dispute concerning the issue of the reasonableness of the replacement access."  Specifically, Schliem contends he disputed items 17, 18, 19, and 20 from the State's statement of undisputed facts submitted in support of the State's motion for summary judgment.  Those facts and responses are as follows:

> **[State's Fact 17]**:  After the Project, drivers wishing to access properties along 63rd Street will likely come from 60th Street, travel north on National Avenue or Gulby Avenue, and then proceed west down 63rd Street to their destination.
>
> **[Schliem's Response]**:  Admit that is a legal alternative access constructed by [the State] following its closure of the intersection at 63rd and Cliff.  After the closure of the intersection, drivers attempting to reach the properties also use routes across the Perkins Restaurant property (Lot 19) to reach E. 63rd St. or use Wayland Avenue from 60th or 61st.  *Neither these nor any alternative built by the State provides a reasonable replacement access.*
>
> **[State's Fact 18]**:  After the Project, drivers coming from the east on 60th Street will likely travel about 1,500 feet less to reach the Property.
>
> **[State's Fact 19]**:  After the Project, drivers coming from the west on 60th Street or the south on Cliff Avenue will likely travel about 1,100 feet more to reach the Property.
>
> **[State's Fact 20]**:  After the Project, drivers coming from the north on Cliff Avenue will likely travel about 3,050 feet farther to reach the Property.
>
> **[Schliem's Response]**:  *Admit but deny the alternative routes provide reasonable access* which is why the fair market value of the properties has diminished significantly.

(Emphasis added.) According to Schliem, "[t]hese disputed facts prohibit summary judgment."

[¶10.] Although the foregoing certainly establishes a dispute between the parties, it does not establish a genuine issue of material *fact*. Schliem and the State disagree that the replacement access to the Property via National and Gulby Avenues is reasonable. However, the question whether replacement access is reasonable is synonymous with the question whether a landowner's right of access has been substantially impaired. *See Hurley v. State*, 82 S.D. 156, 163-64, 143 N.W.2d 722, 726 (1966). Although some jurisdictions have held that this question is one of fact, "[i]n most jurisdictions, the issue . . . is a question of law." 4A Julius L. Sackman, *Nichols on Eminent Domain* § 14.02[3][c][ii] (3d ed., rel. 116-12/2014).[5] South Dakota adheres to the majority rule. *Rupert v. City of Rapid City*, 2013 S.D. 13, ¶ 29, 827 N.W.2d 55, 67 ("[T]he ultimate determination of whether government conduct constitutes a taking or damaging is a question of law for the court."); *Hall v. State ex rel. S.D. Dep't of Transp.*, 2006 S.D. 24, ¶ 8, 712 N.W.2d 22,

---

5. *See Triangle, Inc. v. State*, 632 P.2d 965, 967-68 (Alaska 1981); *Breidert v. S. Pac. Co.*, 394 P.2d 719, 722 n.4 (Cal. 1964) (en banc); *State Dep't of Hwys., Div. of Hwys. v. Davis*, 626 P.2d 661, 665 (Colo. 1981) (en banc); *Palm Beach Cty. v. Tessler*, 538 So. 2d 846, 850 (Fla. 1989); *Dep't of Transp. v. Taylor*, 440 S.E.2d 652, 655 (Ga. 1994); *Dep't of Pub. Works & Bldgs. v. Wilson & Co.*, 340 N.E.2d 12, 17 (Ill. 1975); *Teachers Ins. & Annuity Ass'n of Am. v. City of Wichita*, 559 P.2d 347, 357 (Kan. 1977); *State ex rel. Dep't of Hwys. v. Linnecke*, 468 P.2d 8, 10 (Nev. 1970); *Narciso v. State*, 328 A.2d 107, 110 (R.I. 1974); *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996); *Stefan Auto Body v. State Hwy. Comm'n*, 124 N.W.2d 319, 321 (Wis. 1963). *Contra State ex rel. Herman v. Schaffer*, 467 P.2d 66, 72 (Ariz. 1970) (en banc); *Wilson v. Iowa State Hwy. Comm'n*, 90 N.W.2d 161, 167-68 (Iowa 1958); *Hendrickson v. State*, 127 N.W.2d 165, 172 (Minn. 1964); *Balog v. State, Dep't of Rds.*, 131 N.W.2d 402, 410 (Neb. 1964); *Cady v. N.D. Dep't of Transp.*, 472 N.W.2d 467, 470 (N.D. 1991); *State Hwy. Comm'n v. Peters*, 416 P.2d 390, 395 (Wyo. 1966).

25 ("[W]hether a taking occurred is a question of constitutional law which we review de novo."); *Hurley*, 82 S.D. at 163-64, 143 N.W.2d at 726 (conducting de novo review of determination that landowner's access had been substantially impaired).[6]

[¶11.] Additionally, Schliem's argument on appeal that the record needs to be more fully developed before judgment is appropriate stands in direct opposition to his argument before the circuit court. Schliem himself asked the circuit court to render summary judgment. In doing so, he necessarily represented to the court that the material facts of this case were undisputed. *See* SDCL 15-6-56(c)(1) ("A party moving for summary judgment shall attach to the motion a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried."). Moreover, in order to avoid summary judgment, Schliem had an obligation to raise a genuine issue of material fact in response to the State's motion for summary judgment. *Gades*, 2015 S.D. 42, ¶ 7, 865 N.W.2d at 158 ("If the moving party properly supports the motion, the nonmoving party may only avoid summary judgment by 'setting forth specific facts showing that there is a genuine issue for trial.'" (quoting SDCL 15-6-56(e))). Thus, even if Schliem was able to produce evidence demonstrating a genuine issue of material fact at this point, he failed to do so either in his own motion for summary

---

6. At oral argument, counsel for Schliem conceded that the question whether compensation is due under Article VI, § 13, of the South Dakota Constitution—e.g., whether a landowner's right of access has been substantially impaired—is a question of law.

judgment or in his responses to the State's motion for summary judgment.[7]

Therefore, we proceed to the legal merits.

[¶12.]	By the time of South Dakota's 1885 constitutional convention, many

courts in other states had interpreted their states' respective takings clauses as

limiting compensation to cases where a state physically appropriated or invaded

land (e.g., "by superinduced additions of water, earth, sand, or other matter").

*Searle v. City of Lead*, 10 S.D. 312, 316, 73 N.W. 101, 103 (1897).  This limited

interpretation of takings clauses resulted from "construing the word 'property' in its

narrow sense as the 'thing' owned, rather than giving to it the broader and truer

meaning of, 'the exclusive right to possess, enjoy, and dispose of, a thing[.]'"  *Hyde v.*

*Minn., Dak. & Pac. Ry. Co.*, 29 S.D. 220, 229, 136 N.W. 92, 95 (1912).  Under these

early decisions, "there was no provision against the mere 'damaging' of the thing

---

7.	The dissent notes that "cross-motions for summary judgment do 'not mean that there are no genuine issues, obliging a court to grant judgment for one side or the other.  Both motions must be denied *if the court detects genuine issues of fact* or genuine issues regarding the inferences to be drawn from the facts.'"  *Infra* ¶ 41 n.26 (emphasis added) (quoting *St. Paul Fire & Marine Ins. Co. v. Engelmann*, 2002 S.D. 8, ¶ 15, 639 N.W.2d 192, 199).  Contrary to the dissent's implication, this opinion does not suggest otherwise.  The point is that Schliem had multiple opportunities to assert *facts* that he viewed as material and disputed.  He failed to do so both before the circuit court and in argument to this Court.  *See supra* ¶¶ 9-10.  While the dissent would nevertheless reverse to grant Schliem yet another opportunity to do so, our firmly established summary-judgment jurisprudence requires otherwise.  *See Gades*, 2015 S.D. 42, ¶ 7, 865 N.W.2d at 158.

Like Schliem, the dissent also fails to identify any issue of material fact in this case.  Instead, the dissent is premised on Schliem's incorrect argument that the parties' disagreement on the reasonableness of the remaining access is a factual dispute.  *See infra* ¶¶ 31-32 & nn.20-21.  As explained above, the question whether access has been substantially impaired (i.e., whether remaining access is reasonable) is a question of law, not a question of fact.  *See supra* ¶ 10 & n.5.

which was the subject of property[;] . . . one could recover only when there was an actual 'taking of the thing.'" *Id.* In recognition of this limitation, the drafters of South Dakota's constitution added the words *or damaged* to Article VI, § 13.[8] *See Searle*, 10 S.D. at 317-19, 73 N.W. at 103-04. Thus, "[p]rivate property shall not be taken for public use, or damaged, without just compensation[.]" S.D. Const. art. VI, § 13.

[¶13.]      In light of the foregoing, the first step in any Article VI analysis[9] must be to determine whether a recognized property right has been infringed by state

---

8.      This conclusion is confirmed by an examination of the constitutional debates of 1885. During debate on the meaning of the proposed Article VI, attorney Robert Dollard commented:

> As I remember it, [the Takings Clause] was in the constitution of the state of Illinois, 1848, which was superceded by the constitution of 1870. That didn't work right. Their experience proved that that was not sufficient to protect the people; hence [the] addition [of the words *or damaged*]. Their condition and our condition is substantially the same. The reason for the addition here is the same as there—that private property shall never be damaged without just compensation. . . . [I]t was held, and I think it was uniformly held by the Supreme Court of the state of Illinois, that it was only the property taken that a man could demand compensation for. They might destroy his property incidentally, but if they did not take it he was not entitled to recover a penny's compensation.

1 Dak. Const. Convention 297 (1885) (Doane Robinson ed., 1907). Mr. Dollard—who was elected attorney general for the provisional government in 1885 and went on to become South Dakota's first attorney general—was uniquely qualified to make these comments. Before moving to Dakota Territory in 1879, Mr. Dollard was admitted to the Illinois bar in 1870.

9.      As the California Supreme Court has explained: "An inverse condemnation action is an eminent domain proceeding initiated by the property owner rather than the condemner. The principles which affect the parties' rights in an inverse condemnation suit are the same as those in an eminent domain action." *Breidert*, 394 P.2d at 721 n.1. *Compare Hurley*, 82 S.D. at 161,

(continued . . .)

conduct. Schliem contends he is entitled to compensation because the Intersection's closure reduced the value of his property. He also contends the closure caused the "loss of assemblage rights." Finally, he claims he had "a legal interest in the intersection at Cliff Avenue and 63rd Street" and that the State substantially impaired his right to access his property by closing the Intersection. None of these arguments are convincing.

[¶14.]     Schliem first contends that the devaluation of the Property alone is sufficient to warrant compensation under Article VI, § 13. However, a landowner is not entitled to compensation under Article VI simply because he has suffered some loss or his property has been devalued as a result of state action. "A property right must be invaded before compensation is allowed." *Darnall v. State*, 79 S.D. 59, 70, 108 N.W.2d 201, 207 (1961); *Hyde*, 29 S.D. at 233-34, 136 N.W. at 97 ("Legal damage is the loss or detriment caused by . . . the infringement of some right vested in one.").[10] "Moreover, one is not [entitled to compensation], though he may have suffered [loss], unless he has suffered the infringement of some right vested in him which right is superior to the right vested in the party causing the damage . . . ." *Hyde*, 29 S.D. at 234, 136 N.W. at 97 (emphasis added). Thus, the word *damaged*, as used in the South Dakota Constitution, contemplates only legal injury. *Id.*

---

(. . . continued)

> 143 N.W.2d at 725 (requiring peculiar injury for recovery in inverse-condemnation case), *with State Hwy. Comm'n v. Bloom*, 77 S.D. 452, 461, 93 N.W.2d 572, 577 (1958) (requiring peculiar injury for recovery in formal-condemnation case).

10.    "What property is and the rights that attach to ownership are primarily a matter of state law." 2 Julius L. Sackman, *Nichols on Eminent Domain* § 5.01[2] (3d ed., rel. 102-7/2011).

When a recognized property interest has not been infringed, "[t]here is no redress, as there is no wrong to redress, *though the [loss] may be great in dollars and cents.*" *Id.* (emphasis added); *accord* 4A Sackman, *supra* ¶ 10, § 14.03[2][c][i] (citing *Campbell v. United States*, 266 U.S. 368, 45 S. Ct. 115, 69 L. Ed. 328 (1924)).[11] Therefore, in the absence of a recognized property right, the mere devaluation of property resulting from state conduct is not a legally cognizable injury and is not

---

11.    Some decisions seem to categorically deny compensation when the state action complained of is labeled a manifestation of the police power rather than the power of eminent domain. For example, this Court has said that

> relocations of a highway, prohibitions against crossing it or against left and U turns, the designation of one-way streets and other similar restrictions and regulations have been upheld as proper exercises of the police power of the state and not of the power of eminent domain. As such they are not compensable.

*Darnall*, 79 S.D. at 68, 108 N.W.2d at 206. However, "[t]he distinction is not whether [the conduct at issue] is a valid exercise of police power but whether . . . the property itself is taken or damaged." *Hurley*, 82 S.D. at 162, 143 N.W.2d at 725 (quoting *Balog*, 131 N.W.2d at 408). "While courts have assumed that designating a regulation an exercise of police power prevents compensation by eminent domain proceedings, for practical purposes this is simply a convenient way of describing which activities confer a right to damages and which do not." *Id.* at 162-63, 143 N.W.2d at 726 (emphasis added) (quoting *Hendrickson*, 127 N.W.2d at 170).

> The fact that [the State] had under the police power the right to improve its streets and thereby control the traffic thereon does not mean that it had immunity from liability to respond in damages which resulted to private property *abutting the improvement* where a part of the property of appellee was taken by condemnation. The exercise of police power may or may not involve the taking of private property and it may or may not involve mere non-compensable inconvenience to the owner thereof.

*Id.* at 162, 143 N.W.2d at 725 (emphasis added) (quoting *Balog*, 131 N.W.2d at 408). Thus, statements like that in *Darnall* should simply be read as recognizing that loss resulting from a state's use of its police power is typically—though not always—noncompensable.

compensable under Article VI, § 13. *See Morris Family, LLC ex rel. Morris v. S.D. Dep't of Transp.*, 2014 S.D. 97, ¶ 28, 857 N.W.2d 865, 873-74.

[¶15.] Next, Schliem contends he is entitled to compensation for the "loss of assemblage rights." However, Schliem has not cited any decision—let alone one from this Court—holding that a landowner's intent to participate in an assemblage is a property right contemplated by Article VI, § 13. On the contrary, the doctrine of assemblage is simply a valuation rule that can affect the measure of compensation due if a recognized property interest has been infringed.[12]

> The doctrine of assemblage applies when the highest and best use of separate parcels involves their integrated use with lands of another. Pursuant to this doctrine, such prospective use may be properly considered in fixing the value of the property if the joinder of the parcels is reasonably practicable. If applicable, this doctrine allows a property owner to introduce evidence showing that the fair market value of the owner's real estate is enhanced by its probable assemblage with other parcels.

*Miller v. Preisser*, 284 P.3d 290, 297-98 (Kan. 2012) (quoting 4 Julius L. Sackman, *Nichols on Eminent Domain* § 13.01[20] (3d ed., 2003)). As explained above, however, the fair-market value of a property is not relevant in a condemnation case unless the predicate question—i.e., whether a recognized property right has been infringed—has already been affirmatively answered. *See supra* ¶ 14. If a

---

12. As noted above, "the ultimate determination of whether government conduct constitutes a taking or damaging is a question of law for the court." *Rupert*, 2013 S.D. 13, ¶ 29, 827 N.W.2d at 67; *accord Hall*, 2006 S.D. 24, ¶ 8, 712 N.W.2d at 25; 4A Sackman, *supra* ¶ 10, § 14.02[3][c][ii]. If the court determines a property right has been taken or damaged, then the case proceeds to a jury. However, our Legislature has declared that "[t]he *only* issue that shall be tried by the jury . . . shall be the amount of compensation to be paid for the property taken or damaged." SDCL 31-19-4 (emphasis added); *accord* SDCL 21-35-15.

recognized property right has not been infringed, then no compensation is due. Thus, because the presence of an assemblage would only affect the measure of compensation, and because the mere allegation of loss is not sufficient to establish a right to compensation under Article VI, § 13, the State's alleged frustration of Schliem's intent to participate in an assemblage does not support his claim that he is entitled to compensation under Article VI, § 13.[13]

[¶16.]        Finally, Schliem contends he has a legal interest in the Intersection— i.e., a right to access the Intersection via 63rd Street. Our cases establish that "the owner of land [has a special, private right] to access [his] land . . . where it abuts upon a highway." *Hyde*, 29 S.D. at 238, 136 N.W. at 99. This right "extends sufficiently beyond his own premises as to insure him *reasonable* facilities for connection with [nonabutting] highways[.]" *Id.* at 238-39, 136 N.W. at 99 (emphasis added). Thus,

> [p]roperty ownership includes two access related rights:
>> the right to pass to or from the public way immediately adjacent to the land ("ingress and egress");

---

13.    The dissent makes a similarly erroneous argument by claiming that "[i]n *Hurley*, this Court considered a property's highest and best use when determining whether a substantial impairment occurred." *Infra* ¶ 37. This claim is factually incorrect. We did not use the change in highest and best use of the property as a basis for concluding a taking had occurred; rather, we referenced the highest and best use in stating the method for calculating the resulting compensation due. In *Hurley*, we said:

> The *measure of damages* for the obstruction or substantial impairment of an abutting landowner's right of access to a street or highway is the difference between the market value of the property considered at its highest, best, and most profitable use immediately before and immediately after the destruction or impairment.

82 S.D. at 164, 143 N.W.2d at 726 (emphasis added).

and the right to go somewhere else once the owner is upon the abutting road, or the right of access to the entire system of roads.

8A Patrick J. Rohan & Melvin A. Reskin, *Nichols on Eminent Domain* § G16.03[2][a] (3d ed., rel. 109-5/2013). Except for the right to access an abutting highway, "the law . . . does not protect any particular access route[.]" 2A Julius L. Sackman, *Nichols on Eminent Domain* § 6.02[5][c] (3d ed., rel. 106-7/2012); *accord State, Idaho Transp. Bd. v. HI Boise, LLC*, 282 P.3d 595, 600 (Idaho 2012). "The right of access is unimpaired if an alternative means of reasonable access exists." 2A Sackman, *supra* ¶ 16, § 6.02[7]; *accord Hyde*, 29 S.D. at 238-39, 136 N.W. at 99. Schliem's property does not abut Cliff Avenue or the Intersection—it only abuts 63rd Street. Therefore, contrary to Schliem's contention, he does not have a right of access to the Intersection per se; instead, he is simply entitled to reasonably convenient access to the system of public highways.

[¶17.] Not every change in access to the system of public highways is unreasonable such that a property owner is entitled to compensation. The right of access is infringed in the constitutional sense only when it is destroyed or *substantially* impaired. *See Hurley*, 82 S.D. at 163, 143 N.W.2d at 726; *Darnall*, 79 S.D. at 70, 108 N.W.2d at 207. "Courts uniformly agree that a reduction in value resulting from 'diversion of traffic' is noncompensable, as is 'mere circuity of travel.'" 8A Rohan & Reskin, *supra* ¶ 16, § G16.03[2][a].[14] Although "[m]ost directional

---

14. The phrases *diversion of traffic* and *mere circuity of travel* refer to distinct legal concepts.

    "Diversion of traffic" implies a reduction in the volume of traffic passing adjacent to the property, and concomitant loss of

    (continued . . .)

traffic regulations, by their very nature, involve mere diversion of traffic and circuity of travel[,]" *id.* § G16.03[2][c][iv], some may nevertheless result in a substantial impairment of access. For example, "[g]overnmental activity that totally landlocks a parcel which previously had access is a taking of property." *Id.* § G16.02[2][b][i]. Likewise, substantial increases in circuity may be compensable. *See Darnall*, 79 S.D. at 67, 108 N.W.2d at 205 ("Circuity of travel is not a compensable damage *under these circumstances . . . .*" (emphasis added)); *City of Memphis v. Hood*, 345 S.W.2d 887, 890 (Tenn. 1961) (discussing *State v. Rascoe*, 178 S.W.2d 392 (Tenn. 1944), which held an increased-travel distance of about seven miles compensable).[15] Other changes in the physical dimensions and conditions of access may also amount to a substantial impairment. *See City of Waco v. Texland Corp.*, 446 S.W.2d 1, 4 (Tex. 1969) (holding the narrowing of an existing

_____

(. . . continued)

patronage. Since government has no vested interest or duty to ensure that a business is successful when it builds roads for the future, an owner likewise can have no reasonable expectation that such roads are fixed forever. The task is to isolate "mere" diversion of traffic cases from compensable takings which, coincidentally, divert traffic.

Circuity of travel implies an indirect and more inconvenient means of reaching the property.

8A Rohan & Reskin, *supra* ¶ 16, § G16.03[2][a].

15. Our citation to *City of Memphis v. Hood* should not be read as suggesting that every increase in circuity of less than seven miles is noncompensable. "The difference between 'mere circuity of travel' and unsuitable access is one of degree, and is directly related to the unique fact pattern in every case." 8A Rohan & Reskin, *supra* ¶ 16, § G16.03[2][a].

street by the installation of support piers for an overpass substantially impaired access to industrial property by preventing use of transport trucks).[16]

[¶18.] In this case, the physical characteristics of Schliem's access routes before and after the Intersection's closure are nearly identical. Schliem's property does not abut the Intersection, and the Intersection's closure did not affect his

---

16. Although the dissent acknowledges that the circuit court applied the correct legal test in this case, the dissent would nevertheless "remand for an evidentiary hearing to more fully develop the record and to apply the test articulated in *Miller & Walsh*." *Infra* ¶ 41. It similarly claims that "[t]he circuit court did not include an analysis of the factors it considered to reach [its] conclusion, nor did it have the benefit of the guidance provided by this Court in *Miller & Walsh*." *Infra* ¶ 33 (footnote omitted). There are several problems with this argument.

The dissent's argument is inconsistent with our *Miller & Walsh* decision. The significance of *Miller & Walsh* is the clarification of *when* to apply the substantial-impairment rule—i.e., a change in access may not be included in calculating the compensation due in the case of a partial taking unless the change in access amounts to a substantial impairment of access. *See Miller & Walsh*, 2016 S.D. 88, ¶¶ 45-46, ___ N.W.2d at ___ (overruling *Schuler v. Bd. of Supervisors of Lincoln Twp.*, 12 S.D. 460, 81 N.W. 890 (1900)). Unlike *Miller & Walsh*, the present case does not involve a partial taking; therefore, the central holding of *Miller & Walsh* has no application in the present case. Although the substantial-impairment rule is of course discussed in *Miller & Walsh*, it did not originate there—that rule has been the law in this State for well over a century. *See Hurley*, 82 S.D. at 164, 143 N.W.2d at 726-27 (1966); *Searle*, 10 S.D. at 316-19, 73 N.W. at 103-04 (1897). Thus, our *Miller & Walsh* decision is not necessary to resolve the issue on appeal in this case.

Even if it was, the dissent's argument is misconceived because it ignores both the procedural posture of this case and the standard under which we review the circuit court's decision. In contrast to *Miller & Walsh*, which involves the appeal of a jury verdict, the present case is an appeal of an order granting summary judgment. Thus, as the dissent concedes, *see infra* ¶ 33 n.23, the circuit court was not required to offer any analysis or issue any conclusions of law whatsoever. SDCL 15-6-52(a) ("Findings of fact and conclusions of law are unnecessary on decisions of motions [for summary judgment]."). Moreover, as noted above, this Court does not afford any deference to the circuit court's conclusions of law on appeal—we apply the de novo standard of review. *See supra* ¶ 10. Because we are not bound by the circuit court's legal conclusions, the law applied by the circuit court is immaterial to our decision.

ability to access 63rd Street in any way. Before the closure, he had to travel approximately 748 feet on 63rd Street—all of which was unimproved, gravel road—before connecting to the general system of public highways. After the closure, he must travel approximately 834 feet on 63rd Street—of which only 534 feet is unimproved, gravel road—to reach the general system of public highways. An increase in circuity of only 86 feet (or about 0.0163 mile) is substantially less than increased circuity held to be noncompensable in other cases.[17] *See Darnall*, 79 S.D. at 62, 108 N.W.2d at 202 (holding one-mile diversion noncompensable); *Triangle*, 632 P.2d at 967 (holding one-half-mile diversion noncompensable); *Ark. State Hwy. Comm'n v. Bingham*, 333 S.W.2d 728, 729 (Ark. 1960) (holding diversion of more than one mile noncompensable). While not every case alleging an impairment of access can be decided by simply comparing travel distances, in this case the two access routes presented for comparison (eastbound and westbound 63rd Street) are physically identical in all other relevant respects. Under these facts, the Property has not been landlocked, and Schliem's replacement access is only marginally more circuitous while otherwise physically identical. Therefore, we conclude that the Intersection's closure did not substantially impair Schliem's general right of access to the system of public highways, and any inconvenience occasioned thereby is not compensable.

---

17.    The dissent's contrasting calculation that "those accessing Schliem's property from Cliff Avenue will travel 3,050 feet farther[,]" *infra* ¶ 30 n.19, reflects the dissent's erroneous belief that a nonabutting landowner has a right to access his property via a particular route. As previously explained, a nonabutting landowner has no such right. *See supra* ¶ 16.

[¶19.]     Even if Schliem's access was materially and substantially impaired by the intersection closure, he is not entitled to compensation. "[I]f the right of access is destroyed or materially impaired, the damages are compensable *if* the injury sustained is peculiar to the owner's land and not of a kind suffered by the public generally." *Hurley*, 82 S.D. at 163, 143 N.W.2d at 726 (emphasis added). "Land that does not directly abut the discontinued roadway and which is still accessible by other public roadways is not specially damaged." 2A Sackman, *supra* ¶ 16, § 6.01[12][c] n.74; *accord Hyde*, 29 S.D. at 239, 136 N.W. at 99 ("[A]ny interference with a highway beyond the point where one's special rights end is not a 'taking or damaging' of property, and is not the infringement of any right giving rise to [an] action for damages."). As previously noted, Schliem's land does not abut the discontinued intersection, and the Property remains accessible from the east. Therefore, Schliem's loss is "different . . . merely in degree from that experienced by the general public." *Rupert*, 2013 S.D. 13, ¶ 10, 827 N.W.2d at 61 (quoting *Krier v. Dell Rapids Twp.*, 2006 S.D. 10, ¶ 26, 709 N.W.2d 841, 848); *see also Hyde*, 29 S.D. at 243, 136 N.W. at 101 ("Possibly the depreciation in plaintiff's property might have been greater in degree than that of other owners of property in the vicinity, but it was of the same nature, and did not physically interfere with any right, easement, or appurtenance belonging to the plaintiff's property."). As such, it is not compensable under Article VI, § 13.

[¶20.]     Schliem nevertheless contends that under our decisions *Hall* and *Hurley*, the circuit court erred by not considering the reasonableness of the State's decision to close the Intersection. In *Hall*, landowners owned a truck stop that

abutted Interstate 90 and Ellsworth Road in Box Elder. The State closed the interchange between Interstate 90 and Ellsworth Road, and the landowners closed their business due to the resulting decline in sales. They brought an inverse-condemnation action against the State, but the circuit court granted a motion for summary judgment in favor of the State. *Hall*, 2006 S.D. 24, ¶¶ 1-7, 712 N.W.2d at 23-24. In reversing and remanding, we said:

> [T]he [circuit] court limited [its] analysis to whether the Owners had a property right to passing traffic. The trial court did not consider whether Owners still had reasonable access, whether their access was materially impaired, or whether their injury was peculiar to their land and not of a kind suffered by the public generally. *Also, the court did not address whether the State's action was arbitrary or unreasonable.*

*Id.* ¶ 20, 712 N.W.2d at 30 (emphasis added). Based on the foregoing language from *Hall*, Schliem concludes that in reviewing an inverse-condemnation claim, a circuit court must always determine whether the State conduct at issue was reasonable.

[¶21.] A careful reading of *Hall* and *Hurley* reveals two distinct reasonableness concepts. The first simply refers to the standard stated above: no compensable injury to access occurs when a landowner is left with reasonable access to his property. *See supra* ¶¶ 16-17. In *Hall*, we said: "[C]onsideration must be given to the reasonableness of the exercise of the state's police powers." 2006 S.D. 24, ¶ 19, 712 N.W.2d at 30. However, we immediately explained and qualified this statement by quoting the following language from *Hurley*:

> The state cannot, under the guise of the police power, impose unreasonable or arbitrary regulations which go beyond that power, and in effect deprive a person of his property within the purview of the law of eminent domain, as by depriving the owner of all profitable use of the property not per se injurious or pernicious, restricting the lawful uses to which the property can be put and destroying its value, permanently so restricting the

-19-

> use of the property that it cannot be used for any reasonable purpose, or completely destroying the beneficial interest of the owner.

*Hall*, 2006 S.D. 24, ¶ 19, 712 N.W.2d at 30 (quoting *Hurley*, 82 S.D. at 163, 143 N.W.2d at 726). In *Hurley*, we introduced this quoted language with the phrase "In other words," which immediately followed the conclusion that a landowner is only entitled to compensation when "the right of access is destroyed or materially impaired" and the resulting loss is peculiar to the owner's land. *Hurley*, 82 S.D. at 163, 143 N.W.2d at 726. In context, then, considering the reasonableness of state conduct simply refers to determining whether the landowner is left with reasonable access—i.e., whether the owner's right of access has been substantially impaired.

[¶22.] The second reasonableness concept mentioned in *Hall* and *Hurley* relates to the validity of the State's purpose. In *Hall*, we said: "The State's purpose . . . is material in determining whether the State's exercise of police power was unreasonable and arbitrary." 2006 S.D. 24, ¶ 21, 712 N.W.2d at 30. In the present case, however, the parties do not dispute the validity of the State's purpose in closing the Intersection.[18] Even if they did, the question whether a state's purpose is valid necessarily precedes the takings analysis. As the United States Supreme Court has explained:

---

18. It is undisputed that the reason for the State's decision to close the Intersection was to facilitate efficient traffic movements on Cliff Avenue and the Interstate 90 on-ramp. In its statement of undisputed material facts supporting its motion for summary judgment, the State asserted: "The proximity of [the intersection of Cliff Avenue and 63rd Street] to the on-ramp hindered efficient traffic movements on Cliff Avenue and the interstate ramp." In his response, Schliem admitted this assertion without qualification.

> [S]uch an inquiry is logically prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose. The Clause expressly requires compensation where government takes private property "*for public use.*" It does not bar government from interfering with property rights, but rather requires compensation "in the event of *otherwise proper interference* amounting to a taking." Conversely, if a government action is found to be impermissible—for instance because it fails to meet the "public use" requirement or is so arbitrary as to violate due process— that is the end of the inquiry. No amount of compensation can authorize such action.

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543, 125 S. Ct. 2074, 2084, 161 L. Ed. 2d 876 (2005) (citation omitted) (quoting *First English Evangelical Lutheran Church of Glendale v. L.A. Cty., Cal.*, 482 U.S. 304, 315, 107 S. Ct. 2378, 2386, 96 L. Ed. 2d 250 (1987)). Likewise, a regulation with an invalid purpose might "not significantly burden property rights at all, and it may distribute any burden broadly and evenly among property owners. The notion that such a regulation nevertheless 'takes' private property for public use merely by virtue of its [invalid purpose] . . . is untenable." *See id.*

[¶23.] In light of the foregoing, Schliem's contention that the circuit court failed to address the reasonableness of the Intersection's closure is only partially correct—the circuit court did not address the validity of the State's purpose because Schliem did not challenge that purpose as improper. However, unlike *Hall*, the court did address the reasonableness of the State's conduct in the context of determining whether reasonable access to Schliem's property remained after the Intersection's closure. The court specifically concluded: "In this case [Schliem's] right of access has not been 'substantially' impaired." Therefore, the circuit court

addressed the only question of reasonableness Schliem presented and correctly concluded that he is not entitled to compensation.

## Conclusion

[¶24.] Article VI, § 13, of the South Dakota Constitution does not require compensation unless state conduct has infringed a recognized property interest. "[T]he mere allegation that plaintiff has suffered damage [does not] suffice . . . ." *Hyde*, 29 S.D. at 236, 136 N.W. at 98. In order for a change in access to constitute an infringement of a property right in the constitutional sense, a landowner's access must be destroyed or substantially impaired. In this case, Schliem's immediate access to the highway abutting his property is completely unaffected by the Intersection's closure. While his access route to the general system of public highways has changed, his access has not been substantially impaired. Schliem failed to allege a genuine issue regarding any fact necessary to reach this conclusion, and we see no basis for giving him another opportunity to do so. Therefore, Schliem has not suffered compensable loss by the Intersection's closure, and the circuit court did not err in granting the State's motion for summary judgment.

[¶25.] We affirm.

[¶26.] ZINTER, SEVERSON, and WILBUR, Justices, concur.

[¶27.] KERN, Justice, dissents.

KERN, Justice (dissenting).

[¶28.] I respectfully dissent. I would reverse and remand for an evidentiary hearing so the record can be more fully developed and the test recently articulated in *State v. Miller & Walsh*, 2016 S.D. 88, ¶ 44, ___ N.W.2d ___, ___, applied.

[¶29.] Before the State's project, Schliem had two access points to and from his property. One was from the south on Wayland Avenue—"a seventeen-foot-wide dirt road that is sometimes impassable." The other was from the west on Cliff Avenue. The only street abutting Schliem's property, 63rd Street, ended in a dead end east of his property. The development to the east of Schliem's property is predominately industrial. The development to the west is predominately commercial.

[¶30.] As part of its project, the State closed the Cliff Avenue access. The State opened the dead end on 63rd Street to the east of Schliem's property and extended it to intersect with National Avenue and Gulby Avenue. In essence, the State's action reversed the orientation of Schliem's property where what used to be the front with prime commercial access is now the back without any access—and the front is now accessed by driving through an industrial park.[19]

[¶31.] During the summary-judgment proceedings, Schliem maintained that the replacement access provided by the State was unreasonable. He offered three property appraisals into the record. The appraisals showed that before the State

---

19. Those wishing to access Schliem's property from Cliff Avenue before the State's project turned east onto 63rd Street and traveled approximately 748 feet. After the project, those accessing Schliem's property from Cliff Avenue will travel 3,050 feet farther—through an industrial park.

closed the Cliff Avenue access, the highest and best use of Schliem's property was commercial development. However, after the State closed the Cliff Avenue access and opened the new access point to the east, the highest and best use of his property changed from commercial use to industrial.

[¶32.] The State failed to refute this evidence. Instead, one week before the summary-judgment hearing, the State submitted an affidavit stating that, "[i]f the [c]ourt agrees with [Schliem] that the proper test for compensability is whether [he] lost reasonable access . . . then the State asks for a continuance to permit the State to obtain additional evidence on this subject." The State maintained that it needed to gather evidence "necessary to establish that the intersection of Cliff Avenue and 63rd Street would not provide reasonable commercial access to [Schliem's] property." A continuance was not granted, and the summary-judgment hearing was held as scheduled. At the summary-judgment hearing, the State urged the court not to consider the reasonableness of the remaining access and to only look to whether the injury was peculiar to the land and not the kind of injury suffered by the general public.[20] The State also asked to submit additional evidence if the court considered the reasonableness of Schliem's remaining access.[21]

---

20. The State argued that "the test for reasonable access applies [only] to landowners who abut a street where their access ha[d] been changed." Because Schliem's property did not abut the access closure on Cliff Avenue, the State maintained that the court must only consider whether Schliem could show a special injury. The state submitted, "So it's this special injury test that applies in this case, not a reasonableness standard."

21. The State urged, "[I]f the [c]ourt decides that you agree with them and that these old cases justify them claiming damages in inverse condemnation as a result of the closure of the intersection, if you think that's the right test, that

(continued . . .)

[¶33.]     Following the summary-judgment hearing, the circuit court issued a letter decision concluding Schliem's access had not been substantially impaired.[22] The circuit court did not include an analysis of the factors it considered to reach this conclusion,[23] nor did it have the benefit of the guidance provided by this Court in *Miller & Walsh*. Remand is necessary in this case because the circuit court lacked an adequate factual basis to fully consider and balance the unique facts of this case.

[¶34.]     It is well settled that "a special private right . . . pertains, not only to the part of the highway abutting the owner's land, but extends sufficiently beyond his own premises as to insure him reasonable facilities for connection with those highways in which he has no special rights." *Hyde*, 29 S.D. 220, 238-39, 136 N.W. at 99. The taking or damaging of this right occurs when the State substantially impairs a landowner's access. *Miller & Walsh*, 2016 S.D. 88, ¶ 43, ___ N.W.2d at ___.

_____

(. . . continued)
    it's a reasonableness test instead of a special injury test that we urged, if you think that's the correct test, then we'd like the opportunity to submit additional evidence . . . to prove that that intersection was not a good place for commercial access for these lots to the east, and in addition, we'd like the opportunity to prove that they didn't suffer the damages that they claim." Additional evidence was not submitted to the circuit court.

22.    The circuit court did not make a determination regarding whether Schliem's alleged injury was peculiar to his land and not the kind suffered by the public in general.

23.    While findings of fact and conclusions of law are "unnecessary" in summary judgment cases, *see* SDCL 15-6-52(a), a reasoned analysis to support the conclusion that a substantial impairment did or did not occur in light of the unique facts of the case is warranted due to the fact-intensive nature of inverse-condemnation cases.

[¶35.] "The determination whether a substantial impairment occurred requires a court to consider the unique fact pattern in each case." *Id.* ¶ 44. Factors that the court may consider include "the nature of the property involved, the character of the access before and after governmental activity, and the location (rural or urban)." *Id.* Moreover, even where normal access remains available, the court may consider whether the "access for which the property was specifically intended [has been] rendered [unreasonably] deficient." *Id.* (quoting *State v. Dawmar Partners, Ltd.*, 267 S.W.3d 875, 879 (Tex. 2008)). In this particular case, the State did not physically take any of Schliem's land. Therefore, Schliem must also demonstrate that the alleged injury he suffered is peculiar to his land and not the kind suffered by the public in general. *Bloom*, 77 S.D. at 461, 93 N.W.2d at 577.

[¶36.] This Court has continually held that "[t]he difference between 'mere circuity of travel' and unsuitable access is one of degree, and is directly related to the unique fact pattern in every case." *Miller & Walsh*, 2016 S.D. 88, ¶ 43 n.3, ___ N.W.2d at ____ n.3 (quoting 8A Rohan & Reskin, *supra* ¶ 16, § G16.03[2][a]).[24] The

---

24. *See also Darnall*, 79 S.D. at 70, 108 N.W.2d at 207 ("[W]here there is no physical taking and the owner's access to the highway on which he abuts is not unreasonably diminished or interfered with, his loss is due to the diversion of traffic, a lawful exercise of the police power and there can be no recovery."); *Hurley*, 82 S.D. at 163, 143 N.W.2d at 726 ("In each case, therefore, the relative rights of the public and private interests must be considered and the reasonableness of the regulation and the degree of its interference with private property determined. If, after the construction of a public improvement an abutting landowner continues to have reasonable access to his property, he has no compensable complaint. But if the right of access is destroyed or materially impaired, the damages are compensable if the injury sustained is peculiar to the owner's land and not of a kind suffered by the public generally."); *Hall*, 2006 S.D. 24, ¶ 18, 712 N.W.2d at 29 ("[A] landowner's right of access and the state's police power to regulate highways

(continued . . .)

majority concludes that Schliem's "access routes before and after the Intersection's closure are nearly identical," *supra* ¶ 18, and focuses on circuity of travel. In doing so, it fails to adequately consider and balance Schliem's evidence. Further, it attempts to balance the parties' relative rights and interests on an incomplete record.

[¶37.] Schliem alleged that his remaining access was unreasonable and that the highest and best use of his property changed from commercial to industrial. In *Hurley*, this Court considered a property's highest and best use when determining whether a substantial impairment occurred.[25] 82 S.D. at 163-64, 143 N.W.2d at

---

(. . . continued)

often conflict. This conflict clearly manifests when the state eliminates an abutting landowner's highway access . . . the relationship between the rights of the property owner and the rights of the state must be considered in light of the facts of each case.").

25. Although *Hurley* involved an abutting landowner, this case is no different. Abutting and nonabutting landowners may have differing property rights. However, the change in highest and best use in *Hurley* went toward determining whether the property right had been substantially impaired— not whether there was an initial property right.

> Before the construction of Interstate 90 free, open, and unobstructed access was available from the property to both Omaha Street on the south and West Boulevard on the east. Its highest, best and most profitable use was for an automobile service station and one of the major considerations contributing to its value for such purpose was the right of access to two streets. Negotiations with major oil companies were in progress when the state erected the steel barrier closing all access to the property from West Boulevard and for a limited distance on Omaha Street. The barrier left access only to the west-bound traffic on Omaha Street. Likewise, all pedestrian traffic was closed off from the east and from the south. Consequently, the Referee correctly concluded plaintiffs' right of access was substantially impaired and they suffered a compensable loss.

*Hurley*, 82 S.D. at 163-64, 143 N.W.2d at 726.

726. Other jurisdictions also recognize highest and best use of a property as a factor to consider in determining whether access rights have been substantially impaired. 8A Rohan & Reskin, *supra* ¶ 16, § G16.03[2][a] ("Some courts hold that the issue of reasonable remaining access can only be determined with reference to the highest and best use of the property."). In New York, it is well settled that "[s]uitability of access is not to be determined in the abstract, but in relation to the need for access inherent in the highest and best use of the property." *E.g., Chemung Canal Tr. Co. v. State*, 456 N.Y.S.2d 518, 519 (N.Y. App. Div. 1982). Other courts have rejected this notion. *See Dawmar*, 267 S.W.3d at 879 ("We have implicitly rejected the proposition that the degree of impairment of access must be evaluated in light of a property's highest and best use."). Regardless, it is implicit from the language used by this Court in *Hurley* that it endorsed consideration of the highest and best use of the property as a factor when determining whether a substantial impairment of access occurred. *See supra* n.25.

[¶38.] Ordinarily, on review, this Court considers the unique fact pattern of the case and then ascertains the degree of the alleged impairment. However, because there was inadequate evidence presented to the circuit court on the reasonableness of Schliem's remaining access, a fully balanced consideration cannot be made and prevents a determination of whether Schliem's access rights were substantially impaired.

[¶39.] In addition to having an incomplete record, the circuit court decided this case before our decision in *Miller & Walsh*. In that case, we reversed and remanded and articulated specific factors that the court should use when

determining whether access rights were substantially impaired. Those factors included "the nature of the property involved, the character of the access before and after governmental activity, and the location (rural or urban)." *Miller & Walsh*, 2016 S.D. 88, ¶ 44, ___ N.W.2d at ___. We also provided that the court must consider whether the "access for which the property was specifically intended [has been] rendered [unreasonably] deficient." *Id.* It is unclear precisely what factors the circuit court used when it concluded that Schliem's access rights were not substantially impaired, but it certainly did not have the benefit of this Court's guidance when this case was decided.

[¶40.] Based on the arguments and admissions of the parties, there was some confusion as to what test applied in this case. *See Hall*, 2006 S.D. 24, ¶ 20, 712 N.W.2d at 30 ("Undoubtedly, the trial court's analysis was hindered by the parties' failure to thoroughly address the issues or offer sufficient evidence."). The State argued that the court should disregard the reasonableness of Schliem's remaining access—even though that is a factor in determining whether his access rights were substantially impaired. Schliem focused on the devaluation of his property. And while the circuit court articulated the correct test, there was also confusion on the part of the court when it found that Schliem did not have a property right but then went on to conclude that Schliem's right of access was not substantially impaired.

[¶41.] All in all, this was a rush to summary judgment.[26] The circuit court and this Court were not presented with adequate evidence to determine whether

---

26. The majority suggests that there are no genuine issues of material fact in dispute and that Schliem, in filing his own motion for summary judgment,

(continued . . .)

the State substantially impaired Schliem's access. I would reverse and remand for an evidentiary hearing to more fully develop the record and to apply the test articulated in *Miller & Walsh*. If the circuit court concludes that Schliem's access rights were substantially impaired, it must then determine whether that impairment was peculiar to his land.

---

(. . . continued)

"necessarily represented to the court that the material facts of this case were undisputed." *Supra* ¶ 11. However, we have held that cross-motions for summary judgment do "not mean that there are no genuine issues, obliging a court to grant judgment for one side or the other. Both motions must be denied if the court detects genuine issues of fact or genuine issues regarding the inferences to be drawn from the facts." *St. Paul Fire & Marine Ins. Co. v. Engelmann*, 2002 S.D. 8, ¶ 15, 639 N.W.2d 192, 199. Here, there were inferences to be drawn from the facts necessary to make a determination on substantial impairment. Moreover, *Hall* came to this Court on cross-motions for summary judgment; yet we still reversed and remanded because the parties disagreed on the purpose of the State's action. *Hall*, 2006 S.D. 24, ¶ 21, 712 N.W.2d at 30. In this case, the parties disagreed on the reasonableness of the remaining access—a factor which the circuit court must consider before deciding whether Schliem's access had been substantially impaired.