#29859-a-MES
**2023 S.D. 58**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

THE STATE OF SOUTH DAKOTA,
Acting by and through the
Department of Transportation and the
South Dakota Transportation Commission,  Plaintiff and Appellee,

v.

LEGACY LAND CO.,  Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE STACY VINBERG WICKRE
Judge

* * * *

JEFFREY G. HURD
EMILY M. SMORAGIEWICZ of
Bangs, McCullen, Butler,
 Foye & Simmons, LLP
Rapid City, South Dakota  Attorneys for defendant
  and appellant.


MARTY J. JACKLEY
Attorney General

SHANE M. PULLMAN
Special Assistant Attorney General
South Dakota Department of Transportation
Pierre, South Dakota  Attorneys for plaintiffs
  and appellees.

* * * *

CONSIDERED ON BRIEFS
OCTOBER 3, 2022
OPINION FILED **11/15/23**

#29859

SALTER, Justice

[¶1.]     As part of a highway improvement project, the South Dakota Department of Transportation (DOT) constructed a median in the highway abutting property owned by Legacy Land Company (Legacy).  The median did not eliminate access to the Legacy property, but it changed it.  Vehicles could no longer make a left turn directly into the Legacy property, and those leaving the Legacy property could only turn right onto the highway.  Legacy argued that the median effected a taking and sought compensation, but the circuit court disagreed and granted the DOT's motion for summary judgment, which Legacy now appeals.  We affirm.

### Factual and Procedural History

[¶2.]     Legacy owns approximately 26.3 acres of undeveloped land on the north side of Catron Boulevard[1] in Rapid City.  Prior to 2010, Catron Boulevard was a two-lane highway that permitted traffic coming from either direction to turn into the Legacy property.  Vehicles leaving the property could also turn left or right onto the highway.

[¶3.]     In 2010, the DOT began a project to upgrade the highway by creating two lanes of traffic going each direction separated by a median.  Prior to the highway expansion project, the DOT named Legacy in a petition seeking to condemn a small portion of Legacy's land for drainage in addition to obtaining a temporary easement during construction, neither of which are directly related to construction of the median.

---

1.     Catron Boulevard is also known as U.S. Highway 16B.

[¶4.]     Once the median was completed, Legacy's three shareholders noted the impact it had upon access to their property. The median does not allow eastbound traffic to immediately access the Legacy property by simply turning left. Instead, motorists must change directions by turning around at median breaks located along the divided highway. Those leaving the Legacy property are also impacted by the presence of the median and may only turn right into the westbound lane of travel.

[¶5.]     The case generated little record activity for several years before 2016 when Legacy filed a motion seeking declaratory relief in which it alleged the DOT "had caused compensable damages" and sought a declaration that the DOT's construction of the median constituted a taking under Article VI of the South Dakota Constitution. The DOT disagreed and sought to resolve the issue by filing the first of two motions for summary judgment. The circuit court denied this initial summary judgment motion at a September 2016 hearing after concluding there were disputed issues of material fact relating to the intended uses of the land. The court did not address the motion for declaratory relief, and Legacy advised the court that it did not intend to pursue the request for formal declaratory relief, given the fact that the takings issue was being substantively litigated as part of the original condemnation action.

[¶6.]     After the parties engaged in pretrial discovery, the DOT renewed its request for summary judgment through a second motion in 2021. Citing the legal standard set out in our cases, the DOT argued that the Catron Boulevard median did not substantially impair Legacy's right of access to its property. Along with its

motion, the DOT filed a statement of undisputed material facts to which Legacy responded.

[¶7.]     In an affidavit, Legacy shareholder Scott Nash stated that at the time of construction, Legacy asked the DOT to install a median break in front of its property, but the request was denied.  Pursuant to access management guidelines contained in administrative rules promulgated by the DOT, median breaks on an expressway, such as Catron Boulevard, should be placed at half-mile increments.  ARSD 70:09:02, App. A.  Under ordinary circumstances, the DOT would have applied this rule and installed a median break corresponding roughly to the western edge of the Legacy property, half a mile from the junction of Catron Boulevard and Highway 79.  However, in this instance, the DOT used its authority under the administrative rules to vary from the standard access plan and install a median break 610 feet east of the access approach to the Legacy property.  In this location, the median break provides direct access to both lanes of traffic for a number of state facilities located on the south side of the highway, including a weigh station, a South Dakota Highway Patrol building, and a South Dakota National Guard installation.

[¶8.]     An aerial image on which the Legacy property is listed as "SITE" provides a helpful illustration:



[¶9.]      Mark Leiferman, Chief Road Design Engineer for the DOT, explained in an affidavit that eastbound traffic could get to the Legacy property by proceeding past it and making a U-turn at the median break 610 feet to the east. Vehicles leaving the Legacy property wanting to travel east must first turn right and proceed west before making a U-turn in the first median break 1,136 feet from the Legacy property. Legacy acknowledges that these routes allow access for passenger vehicles, but it claims these options are not reasonable for larger commercial vehicles.[2]

[¶10.]      Neither party disputed that these U-turns would not be possible for semi tractor-trailers and other large commercial vehicles. For these, the DOT contended that large eastbound commercial vehicles seeking access to Legacy's property could turn into the weigh station area and loop back through the median

---

2.    Legacy's acknowledgement came in response to the DOT's statement of undisputed material facts, though Legacy's shareholders also reported difficulty navigating the U-turn with their personal vehicles, which include a large pickup and a sport utility vehicle.

break for a total additional distance of less than half a mile. For a large commercial vehicle leaving the Legacy property wishing to go east, the DOT cited a report by Legacy's expert, who stated that a semi tractor-trailer could reroute to the east by turning at 5th Street and using existing streets.

[¶11.] Legacy's expert was a professional engineer named Brian Horan, who stated that the construction of the median did "not provide reasonable access" consistent with the zoned uses which allow for commercial and medium density residential development. Horan also confirmed that the U-turn at the medians to the east and west would be possible for passenger vehicles but not for larger commercial vehicles. For larger vehicles moving eastbound, Horan noted they could "travel to E. Minnesota St. to circulate off of Elk Vale Rd and back to the site approximately 1.3 miles to the east." Horan did not provide an exact additional distance that larger vehicles would be required to travel when leaving the Legacy property in order to head east, but he stated that it could be accessed by "circulating through the grid of streets" likely through neighborhoods to the north.

[¶12.] Horan also referenced plans for a future frontage road which he sourced to a "Comprehensive Plan" that provided transportation recommendations and was published by the City of Rapid City in 2014. Horan opined that "once constructed, [the frontage road] would provide convenient opportunities to access the site from either direction." But Horan's letter added, "[c]urrently no plans or funding are available to construct these roadways and will likely be built coincident with site development." The location of the proposed frontage road is illustrated in the following map:



Figure 4 Major Street Plan

[¶13.]     The circuit court granted the DOT's motion for summary judgment in a written decision, concluding the construction of the median did not result in a compensable taking.  In the court's view, the Catron Boulevard median did not substantially impair access to the Legacy property even for large commercial vehicles because there were other ways for these vehicles to access Legacy's property without having to make U-turns at the median breaks.  Focusing principally on aerial photographs, the court described an access route to the east of Legacy's property that was essentially the option described by the DOT.

[¶14.]     To the west, the circuit court noted, as Legacy's expert had, that future development plans contemplate an extension of a road, known as Stumer Road, which would then serve as a frontage road for convenient access for future commercial development on Legacy's property.

[¶15.]     Legacy moved for reconsideration, arguing the circuit court determined disputed facts when it concluded that the restrictions on access created by the Catron Boulevard median were reasonable and did not substantially impair

Legacy's right of access. In particular, Legacy claimed there was "no undisputed evidence" in the record regarding: 1) the specific alternate routes to Legacy's property; and 2) "what conditions surround[] any alternative access routes [that] make them potentially reasonable or unreasonable." The court denied Legacy's motion to reconsider.

[¶16.] Legacy has appealed, arguing the court erred when it determined that the DOT's installation of the median did not substantially impair access to its property and cause a compensable taking.

## Analysis and Decision

[¶17.] Our review of a circuit court's determination of a summary judgment motion is well established.

> A grant or denial of summary judgment is reviewed de novo. When conducting a de novo review, we give no deference to the circuit court's decision to grant summary judgment. When reviewing a circuit court's grant of summary judgment, this Court only decides whether genuine issues of material fact exist and whether the law was correctly applied. We view the evidence most favorably to the nonmoving party and resolve reasonable doubts against the moving party.

*Yankton Cnty. v. McAllister*, 2022 S.D. 37, ¶ 15, 977 N.W.2d 327, 334 (citations omitted).

[¶18.] Additionally, and of particular importance in this case, "[t]he nonmoving party . . . must present specific facts showing that a genuine, material issue for trial exists." *Sacred Heart Health Servs., Inc. v. Yankton Cnty.*, 2020 S.D. 64, ¶ 11, 951 N.W.2d 544, 548 (quoting *Zochert v. Protective Life Ins. Co.*, 2018 S.D. 84, ¶ 19, 921 N.W.2d 479, 486). "[T]he nonmoving party to a summary judgment motion may not sit idly by where the moving party has established a prima facie

case for granting the motion." *Kimball Inv. Land, Ltd. v. Chmela*, 2000 S.D. 6, ¶ 17 n.3, 604 N.W.2d 289, 294 n.3.

[¶19.] Article VI of the South Dakota Constitution provides that "[p]rivate property shall not be taken for public use, or damaged, without just compensation[.]" S.D. Const. art. VI, § 13. To resolve takings questions, we must first decide "whether a recognized property right has been infringed by state conduct." *Schliem v. State ex rel. Dep't of Transp.*, 2016 S.D. 90, ¶ 13, 888 N.W.2d 217, 224. "[T]he determination whether a property interest was taken or damaged for public use is a question of law for the court." *State ex rel. Dep't of Transp. v. Miller*, 2016 S.D. 88, ¶ 43, 889 N.W.2d 141, 154; *see also* SDCL 31-19-4 (stating that, in condemnation cases, "[t]he only issue that shall be tried by the jury upon the petition shall be the amount of compensation to be paid for the property taken or damaged."); SDCL 21-35-15 (same).

[¶20.] As it relates to the takings issue in this appeal, we have recognized that "[a]ccess is a property interest." *Miller*, 2016 S.D. 88, ¶ 42, 889 N.W.2d at 154. But that is not to say that all restrictions upon access to property constitute a taking:

> [A]n abutting landowner has a right of ingress and egress that pertains, not only to the part of the highway abutting the owner's land, but extends sufficiently beyond his own premises as to insure him reasonable facilities for connection with those highways in which he has no special rights. However, the right of ingress and egress . . . [is] subject to reasonable regulations in the public interest and for the promotion of public convenience and necessity. Where there is no physical taking and the owner's access to the highway on which he abuts is not unreasonably diminished or interfered with, his loss is due to diversion of traffic, a lawful exercise of the police power and there can be no recovery.

*Id.* (cleaned up).

[¶21.] Under the resulting rule, "[t]he right of access is infringed in the constitutional sense only when it is destroyed or *substantially* impaired." *Schliem*, 2016 S.D. 90, ¶ 17, 888 N.W.2d at 227.[3] "Substantial impairment of access is not the same as diversion of traffic or mere circuity of travel. The difference is a matter of degree and depends on the fact pattern in each case." *Miller*, 2016 S.D. 88, ¶ 43, 889 N.W.2d at 154–55 (footnote omitted). As part of this case-by-case analysis, a court may consider factors such as "the nature of the property involved, the character of the access before and after governmental activity, and the location (rural or urban)." *Id.* ¶ 44, 889 N.W.2d at 156. However, "[c]ourts uniformly agree that a reduction in value resulting from 'diversion of traffic' is noncompensable, as is 'mere circuity of travel.'" *Id.* ¶ 43 n.3, 889 N.W.2d at 154. We have observed, in this regard, that:

> Although [m]ost directional traffic regulations, by their very nature, involve mere diversion of traffic and circuity of travel, some may nevertheless result in a substantial impairment of access. For example, governmental activity that totally landlocks a parcel which previously had access is a taking of property. Likewise, substantial increases in circuity may be compensable.

*Schliem*, 2016 S.D. 90, ¶ 17, 888 N.W.2d at 227 (cleaned up).

---

3. Consistent with the general view that takings determinations present questions for the court, we have held specifically that whether a landowner's right of access has been substantially impaired is a question of law for the court to decide. *Schliem*, 2016 S.D. 90, ¶ 10, 888 N.W.2d at 222–23. Additionally, "the question whether replacement access is reasonable is synonymous with the question whether a landowner's right of access has been substantially impaired." *Id.* ¶ 10, 888 N.W.2d at 222.

[¶22.] Here, the circuit court correctly applied these substantive takings principles and the summary judgment standard to conclude that the installation of the Catron Boulevard median did not constitute a taking. Legacy's access was not eliminated, and some additional perspective concerning the impact of the median is helpful, particularly in light of the dissent's view.

[¶23.] There are four potential access options involving Legacy's lot—entry from the east, entry from the west, exit to the east, and exit to the west. For half of these, the undisputed material facts establish that the median and directional control creates *no impairment,* substantial or otherwise. Entry from the east and exit to the west are entirely unaffected by the median. And there is no argument that access from the west and exit to the east are *substantially* impaired for any other class of vehicles, besides the largest types of trucks and semi tractor-trailers.

[¶24.] For these vehicles that are not able to execute a U-turn at the median breaks, there are other routes to access the property that, while adding to the circuity of travel, do not substantially impair access. For instance, semi tractor-trailers traveling east can turn into the weigh station area to turn around and proceed back west to the Legacy property, totaling less than a mile of circuity. But even if this route were impractical, Legacy's expert stated that vehicles from the west could travel a separate route which adds about 1.3 miles.

[¶25.] Larger vehicles leaving the Legacy property wishing to head east can turn right and head west a short distance before turning on 5th Street and navigating the streets to change directions back to the east. For this class of traffic, Legacy has not supported its circuity of travel claim with specific facts that

establish how far the additional travel to reroute back to the east would be. Its expert explained only that larger vehicles could travel back east "through the grid of streets accessed from 5th St.," which the maps in the record confirm is a similar additional distance to that of the vehicles attempting to access the property from the west. Maps contained in the record also indicate that the 5th Street intersection is less than a mile from Legacy's property.

[¶26.] In any event, it is not necessary for a court to identify *the* specific route for larger vehicles in order to correctly assess the degree of relative impairment; it is only necessary for a court to make a sustainable legal determination that other available routes are not so onerous that there is substantial impairment of access. And in this regard, the test for determining a compensable taking is not solely restricted to circuity of travel for a particular class of vehicles. Here, the record supports the circuit court's determination that there are sufficient alternative routes for larger vehicles to access and leave the Legacy property.

[¶27.] Beyond these observations regarding access after the installation of the median, our decisional law also directs the court to consider the nature of the affected property in determining the question of substantial impairment. *See Miller*, 2016 S.D. 88, ¶ 44, 889 N.W.2d at 156. Legacy steadfastly argues that its property should be considered commercial in nature, citing the fact that it has installed sewer and water infrastructure with future commercial development in mind.

[¶28.] But even accepting Legacy's assertions in this regard does not detract from the circuit court's conclusion and Legacy's acknowledgment that it has no

immediate development plan for the property, which is currently an empty lot.[4]

Legacy has not demonstrated the existence of disputed facts regarding the present or future need for large vehicles to access the property. For instance, there is no indication of how many or how frequently large vehicles need to access the property.[5]

[¶29.] The most Legacy can claim is that its property holds the *potential* for commercial development. When future development does occur, Legacy's expert opined, it would likely coincide with the extension of Stumer Road to a frontage road that provides direct access to the Legacy property consistent with the City's 2014 Comprehensive Plan. The circuit court reached the same conclusion.

[¶30.] Though the circuit court determined that Legacy had no current development plan, the court specifically acknowledged the potential for commercial development at the Legacy site, noting that the City's 2014 Comprehensive Plan allows "substantial flexibility in the development to adapt to surrounding changes, such as expansion of surrounding highways and roads." These conclusions are supported by the record.

---

4. Legacy claims that it had previously submitted commercial development plans to the City of Rapid City. The record is not clear on when this development plan was submitted or its details, but Legacy's attorney agreed with the assertion by counsel for the DOT at the summary judgment hearing that currently "there's not a development plan filed with the city for future development of this property."

5. That is not to say that access to an undeveloped lot cannot be substantially impaired. We held in *Hurley v. State* that a highway project that eliminated access to an undeveloped lot could constitute a taking. 82 S.D. 156, 165, 143 N.W.2d 722, 727 (1966). Here, however, access to Legacy's property is most certainly not eliminated, and we do not view the result in *Hurley* to be controlling.

[¶31.]    As it is presented here, Legacy's assertion that it now cannot develop the land to its full potential is essentially a valuation argument. However, our decisions make clear that we cannot reach a valuation question unless and until there is a determination that the State's action resulted in a compensable taking or damage claim. *See Schliem*, 2016 S.D. 90, ¶ 14, 888 N.W.2d at 224 ("[A] landowner is not entitled to compensation under Article VI simply because he has suffered some loss or his property has been devalued as a result of state action. 'A property right must be invaded before compensation is allowed.'" (quoting *Darnall v. State*, 79 S.D. 59, 70, 108 N.W.2d 201, 207 (1961))). Indeed, if we were to accept the argument, Legacy could potentially receive compensation for restricted access it has not needed to undeveloped land.

[¶32.]    Legacy's principal and recurring argument is that there is "no undisputed evidence" in the record regarding the reasonableness of the access restriction created by the Catron Boulevard median. However, this view fails to account for Legacy's obligation as the non-moving party in a summary judgment proceeding. Legacy may not, as indicated above, stand idly by in circumstances like those present here where the DOT has presented undisputed facts to establish a colorable claim that the presence of the Catron Boulevard median has not substantially impaired Legacy's access to its property.

[¶33.]    It is true, as Legacy argues, that the reasonableness of the restriction implicates a fact-intensive inquiry relating to the substantial impairment determination. But this does not necessarily preclude summary judgment or require a trial. The contrary view operates on the incorrect premise that summary

judgment is categorically *never* authorized for fact-intensive inquiries, such as the taking/substantial impairment analysis here.

[¶34.]	Even inquiries which are factual in nature are amenable to summary judgment where the material facts—the ones that matter to the outcome—are undisputed. *See* SDCL 15-6-56(c) (Rule 56) ("The judgment sought shall be rendered forthwith if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."); *see also Davies v. GPHC, LLC*, 2022 S.D. 55, ¶ 28, 980 N.W.2d 251, 261 (noting that not "all factual questions are *disputed*"). As indicated above, a non-moving party resisting summary judgment on the basis that there are disputed issues of material fact must "substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor on more than mere speculation, conjecture, or fantasy." *Davies*, 2022 S.D. 55, ¶ 29, 980 N.W.2d at 261 (quoting *Stern Oil Co. v. Brown*, 2012 S.D. 56, ¶ 8, 817 N.W.2d 395, 398). Indeed, the Rule 56 standard contemplates this by instructing a court to examine "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," for the existence of disputed issues of material fact.

[¶35.]	We have previously applied the familiar and accepted Rule 56 standard and upheld a circuit court's decision to grant the DOT's motion for summary judgment in another access-to-property case. In *Schliem*, we affirmed the circuit court's decision to grant summary judgment to the DOT even amid the landowner's argument contesting the reasonableness of access restrictions. *Schliem*, 2016 S.D. 90, ¶¶ 9–10, 888 N.W.2d at 222. We observed that "[a]lthough

the foregoing certainly establishes a dispute between the parties, it does not establish a genuine issue of material *fact*." *Id.* ¶ 10.

[¶36.] Here, Legacy makes what it characterizes as a specific disputed fact argument, in addition to its "absence of undisputed fact" claims. It points to its expert's opinion that the Catron Boulevard median did not allow for "reasonable access" to Legacy's property. But this is a disputed *legal opinion*, not a disputed fact, and does not preclude summary judgment. *See Seff v. Broward Cnty., Fla.*, 691 F.3d 1221, 1224 (11th Cir. 2012) (holding a "legal opinion alone would not create a factual dispute precluding summary judgment"). While we must view the evidence in favor of the nonmoving party, we need not treat the opinions of reasonableness offered by experts the same way because reasonableness is a legal conclusion to be made by the court. *Accord LP6 Claimants, LLC v. S.D. Dep't of Tourism & State Dev.*, 2020 S.D. 38, ¶ 12, 945 N.W.2d 911, 915 ("[W]hile the court must accept allegations of fact as true when considering a motion to dismiss, the court is free to ignore . . . sweeping legal conclusions cast in the form of factual allegations." (alteration in original) (citation omitted)).

[¶37.] Based upon the undisputed facts contained in the record, Legacy has failed, as the non-moving party in this summary judgment proceeding, to demonstrate the existence of disputed material facts relating to the circuit court's substantial impairment determination.[6]

---

6.  Though we adopt no categorical rule in this case, we do note that other jurisdictions considering the question have concluded that the installation of medians is generally viewed as a noncompensable exercise of police power. *See* 2A NICHOLS ON EMINENT DOMAIN § 6.02[8][b] (2022) (citing to 28

(continued . . .)

[¶38.]     Finally, even if we were to determine that the median substantially impaired Legacy's access to its property, that would not end the analysis under the circumstances of this case.  As was explained in *Miller*:

> If the change in access amounts to substantial impairment and is caused by the physical taking of a landowner's property, the landowner is entitled to compensation for the substantial impairment of access as an element of severance damages.  *If the change in access amounts to substantial impairment and is not caused by the State's actual taking of the landowner's property, then the landowner must demonstrate that he or she meets the requirements of an inverse-condemnation claimant: the landowner must also prove that the injury is peculiar to the landowner's property and not of a kind suffered by the public as a whole.*

2016 S.D. 88, ¶ 45, 889 N.W.2d at 156 (emphasis added).

[¶39.]     Here, Legacy has not demonstrated the existence of disputed material facts on the question of whether the injury is peculiar to it and distinct from the kind suffered by the public as a whole.  Based upon the current record, it appears all drivers and landowners along this particular portion of Catron Boulevard must deal with the median.  The *kind* of injury does not seem particular to Legacy.

---

(. . . continued)

jurisdictions when stating, "The placement of a median, median strip, or medial area is a proper exercise of the police power and does not constitute a compensable taking under the power of eminent domain."); *see also State v. Dunn*, 888 N.E.2d 858, 869 (Ind. Ct. App. 2008) ("[T]he construction of a median in a roadway that causes traffic traveling to and from an abutting property to travel a circuitous route does not constitute a compensable taking under Indiana eminent domain law."); *Hales v. City of Kansas City*, 804 P.2d 347, 350 (Kan. 1991) ("We conclude that limiting the landowners' ingress and egress to lanes for southbound travel when they formerly had direct access to both the northbound and southbound lanes of traffic, whether by a median strip, one-way street, or no left turn, is a valid exercise of police power and is not compensable."); *Dale Props., LLC v. State*, 638 N.W.2d 763, 767 (Minn. 2002) (holding that the closure of a median crossover thereby limiting traffic access to the property to one direction was not compensable).

Rather it is "different . . . merely in degree from that experienced by the general public." *Schliem*, 2016 S.D. 90, ¶ 19, 888 N.W.2d at 229 (ellipse in original).[7]

**Conclusion**

[¶40.]     The construction of the median for Catron Boulevard undoubtedly affected the ease with which vehicles traveling east can access Legacy's property. However, the undisputed material facts do not support Legacy's claim that the median substantially impaired its right of access.

[¶41.]     We affirm.

[¶42.]     JENSEN, Chief Justice, and DEVANEY and MYREN, Justices, concur.

[¶43.]     KERN, Justice, dissents.

KERN, Justice (dissenting).

[¶44.]     I respectfully dissent from the majority's view that the summary judgment order should be affirmed. This eminent domain case should be remanded for further evidentiary proceedings because there are disputed issues of material fact regarding whether the Department of Transportation's (DOT) median on Highway 16B substantially impaired Legacy Land Company's (Legacy) access to its

---

7.     In a separate argument, Legacy claims that the DOT acted unreasonably by deviating from the access management guidelines and locating the median break to the east of the Legacy property to accommodate access to the weigh station, the Highway Patrol, and the National Guard. However, the DOT's administrative rules allow for deviation from its general guidance of median breaks at half-mile intervals. *See* ARSD 70:09:02:01 (stating that "[a]n engineering study of sight distance, corner clearance, operational efficiency, safety and adjacent land use may also be conducted by department personnel prior to granting access and may alter the criteria shown in the table"). Legacy is not seeking relief in the form of relocation of the median, and in any case, Legacy has not shown how noncompliance with the regulation entitles them to compensation through a takings claim.

property. At this juncture, Legacy has also sufficiently demonstrated injury separate and distinct from that of the general public because other nearby properties are not similarly affected by the median. After hearing testimony from both sides, the circuit court will be in a better position to rule on the highly fact-intensive questions present here. Disposing of these issues on the basis of affidavits and depositions results in a rush to judgment from an incomplete record with several unresolved questions of fact.

[¶45.] "Private property shall not be taken for public use, or damaged, without just compensation." S.D. CONST. art. VI, § 13. Through this provision, the South Dakota Constitution "provides greater protection for its citizens than the United States Constitution because our Constitution requires that the government compensate a property owner not only when a taking has occurred, but also when private property has been damaged." *State ex rel. Dep't of Transp. v. Miller*, 2016 S.D. 88, ¶ 39, 889 N.W.2d 141, 153 (internal quotation marks omitted). We have held that, where a court determines as a matter of law that the State has substantially impaired access to a certain property, the plaintiff is "permitted to present evidence of the impaired access as it relates to the fair market value of their property after the taking." *Id.* ¶ 43, 889 N.W.2d at 155. The question here, however, is narrower: Whether the DOT was entitled to summary judgment that the median on US Highway 16B *did not* substantially impair access to Legacy's property.

[¶46.] According to our holding in *Miller,* courts should weigh substantial impairment based on "the nature of the property involved, the character of the

access before and after governmental activity, and the location (rural or urban)." *Id.* ¶ 44, 889 N.W.2d at 156. In short, courts are required to "consider the unique fact pattern in each case." *Id.* Importantly, the majority declines to adopt any categorical rule regarding medians, affirming *Miller's* seminal holding that a change in access can constitute a taking if there is substantial impairment and peculiar injury to the plaintiff. *See id.* ¶ 45, 889 N.W.2d at 156.

[¶47.] Turning to the specifics of this case, there are several unresolved issues of material fact concerning reasonability of access, particularly for commercial traffic, after construction of the median. In addition, both parties heavily dispute how and to what extent Legacy's future plans for the property are impacted by the reduced access, a central component of the impairment analysis. Summary judgment "should not be granted unless the moving party has established the right to a judgment with such clarity as to leave no room for controversy." *Hanson v. Big Stone Therapies, Inc.*, 2018 S.D. 60, ¶ 38, 916 N.W.2d 151, 161. Although a nonmoving party "must present specific facts showing that a genuine, material issue for trial exists," *Sacred Heart Health Servs., Inc. v. Yankton Cnty.*, 2020 S.D. 64, ¶ 11, 951 N.W.2d 544, 548, courts should "view the evidence most favorably to the nonmoving party and resolve reasonable doubts against the moving party." *Yankton Cnty. v. McAllister*, 2022 S.D. 37, ¶ 15, 977 N.W.2d 327, 334. The contested facts present here should have been construed in favor of Legacy and summary judgment denied.

[¶48.] The circuit court suggested that eastbound vehicles seeking to enter Legacy's property should make a U-turn at a median break on Highway 16B with

no stoplight.  Vehicles unable to complete this maneuver, according to the court, should turn into a weigh station area, follow a "loop" to turn around, cross 60 mph oncoming traffic, pass through a median break while turning left, and then prepare to promptly enter the property from the right lane.[8]  The court also speculated that Stumer Road "could provide[] potential future access to commercial development on" Legacy's property.  As one further alternative, the majority identifies an alternate route, initially proposed by Legacy's expert, where eastbound large vehicles would travel 1.3 miles, partially through residential areas, to access the property entrance heading west.  The majority suggests a similar route for large vehicles wishing to depart to the east.

[¶49.]     Legacy's complaint is not mere circuity of access.  Rather, Legacy argues that the alternate routes identified by the circuit court are not reasonable for the intended commercial use of the property.  Although extensive circuity can be a sufficient condition for a finding of substantial impairment, other factors are relevant as well, including "the nature of the property involved . . . and the location (rural or urban)."  *Miller*, 2016 S.D. 88, ¶ 44, 889 N.W.2d at 156.

[¶50.]     At this stage, a proper evaluation of the alternative entrance routes referenced above is virtually impossible due to factual disputes and uncertainties in the record.  Even if eastbound small passenger vehicles are able to negotiate a U-

---

8.     The majority suggests "there is no argument that access from the west and exit to the east is *substantially* impaired for any other class of vehicles, besides the largest types of trucks and semi tractor-trailers."  *Ante* ¶ 23.  However, at this stage, it is an open question whether requiring drivers to make the dangerous U-turn constitutes reasonable access, regardless of the size of the vehicle.

turn into 60 mph oncoming traffic without a stoplight, both parties acknowledge that this is not possible for many larger vehicles. The viability of the alternate route through the weigh station is also not sufficiently supported by the record. It is unclear whether a large commercial vehicle, such as a semi, would be able to turn left through the median break after coming out of the weigh station and then almost immediately turn into the property from the right lane. This route was not proposed by the DOT below and there is insufficient testimony as to its feasibility.

[¶51.]    Furthermore, the suggested route down Stumer Road is purely hypothetical. Substantial impairment should not be judged based on future access points that may or may not come to fruition. Rather, courts should evaluate impairment as of the time of the taking. Here, at the time the median was constructed, Stumer Road did not provide access to Legacy's property. There is also no evidence that such development of Stumer Road was or is certainly impending.[9] Thus, this speculative access point should not be used to support a finding of no substantial impairment.

[¶52.]    Factual assertions from Legacy's experts also call into question the reasonability of the proposed routes. Although the majority is correct that expert opinions as to ultimate legal conclusions do not preclude summary judgement, it is equally true that "the court must accept allegations of fact [from the nonmoving party] as true when considering a motion to dismiss." *LP6 Claimants, LLC v. S.D.*

---

9.    According to Scott Nash, the President of Legacy, the development of a frontage road such as Stumer hinges on an owner whose property "sandwich[es]" the Legacy property. Apparently, the owner "has not developed his properties to this day."

*Dep't of Tourism & State Dev.*, 2020 S.D. 38, ¶ 12, 945 N.W.2d 911, 915. Legacy's

experts assert that, in order to access the property from the west:

> a heavy vehicle would be required to travel to E. Minnesota St.
> to circulate off of Elk Vale Rd. and back to the site
> approximately 1.3 miles to the east. Similarly, for vehicles
> leaving the property to head east, which represents a large
> percentage of site traffic due to traffic being oriented to the SD-
> 79, a U-turn is not possible at the median break to the west and
> must be accomplished by circulating through the grid of streets
> accessed from 5th St.

The experts go on to note that:

> With these restrictions in place, the most convenient route
> would be through the connections and neighborhoods to the
> north . . . This is both undesirable to residents who live in the
> neighborhoods and would result in more traffic than the two-
> lane roadways would be able to manage. Additionally, heavy
> vehicle traffic is restricted along these roadways and these
> heavy vehicles would still have a lack of convenient access.

[¶53.] Taking these statements of fact as true, it is unclear whether routing

heavy commercial traffic on the majority's proposed 1.3-mile detour through

residential areas is even possible. While it is true that "it is not necessary for a

court to identify *the* specific route," *Ante* ¶ 26, it is telling that the circuit court and

majority struggle to present *any* route that is not undermined by factual

ambiguities and disputes in the record. The majority attempts to sidestep this issue

by pointing out that the median does not prevent traffic from exiting to the west or

entering from the east. But this ignores Legacy's factual assertion that "vehicles

leaving the property to head east . . . represents a large percentage of site traffic

[due] to traffic being oriented to [] SD-79." This eastbound exiting traffic, in

addition to vehicles entering from the west, would have to follow the previously

described routes to exit or access the Legacy property.

[¶54.]     The majority is correct that we "gauge[] substantial impairment to access generally." *Ante* ¶ 26. However, the facts proffered by Legacy, at the very least, call into question whether departing commercial traffic can reach SD-79 through any of the routes proposed by the majority here or the circuit court below. Without such access, which "represents a large portion of site traffic," commercial development becomes substantially more difficult, if not impossible. Legacy would thus be deprived of the "highest, best and most profitable" uses of the property. Because the median fundamentally alters Legacy's access to Highway 16B and its ability to develop the property to its fullest potential, it is inappropriate to conclude at this stage that substantial impairment could not be demonstrated over the course of further proceedings.

[¶55.]     The majority also errs by dismissing the possibility of eventual commercial use of the property. The mere fact that no development plan is currently on file with the City of Rapid City does not demonstrate that Legacy has no plans to commercially develop the property. Sewer and water infrastructure has already been installed to support future commercial development. Prior to the installation of the median, Legacy met with Walmart developers about a possible sale of the property. These discussions ended after the median reduced access. Legacy has also previously submitted commercial development plans to the City. According to Nash, "Legacy always intended to develop the property for commercial use."

[¶56.]     For purposes of summary judgment, we must accept these factual allegations as true. Legacy clearly envisioned commercial development of the

property and took affirmative steps in this direction. The effects of the median should be judged against this intended use. Contrary to the majority's assertion, this is not a valuation argument since the inquiry focuses on how the State has affected the use of a property, irrespective of any valuation changes. This use analysis is directly related to the nature of the property, one of our impairment factors. According to the facts proffered by Legacy, the median renders regular commercial traffic to the property likely impossible. Since Legacy, on this record, is unable to put the property to regular commercial use because of the median, it is difficult to imagine what more would be needed for substantial impairment.

[¶57.]     Finally, the majority hedges, claiming that, even if there is substantial impairment this "*kind* of injury does not seem particular to Legacy." *Ante* ¶ 39. It is not true that "all drivers and *landowners* along this particular portion of Catron Boulevard must deal with the median." *Ante* ¶ 39. Other nearby properties are located next to median breaks that allow traffic to enter and exit in both directions. Legacy is also uniquely affected because of its intended commercial use of the property. Although drivers of eastbound small cars may be able to reach the property through a U-turn, the record, viewed most favorably to Legacy, demonstrates that regular access by large vehicles is likely not possible. Legacy thus experiences a unique injury to its property.

[¶58.]     In conclusion, this case was not ripe for summary judgment given the existence of material issues of fact regarding the impairment analysis. For the foregoing reasons, I respectfully dissent.