#30723-r-PJD
**2026 S.D. 8**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,
Acting by and through the Department of
Transportation and the South Dakota
Department of Transportation Commission,      Plaintiff and Appellant,

v.

CHARLES J. GUSTAFSON and
HEATHER S. GUSTAFSON,                          Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JON SOGN
Judge

* * * *

KARLA L. ENGLE
DUSTIN W. DEBOER
SHANE M. PULLMAN of
Special Assistant Attorneys General
South Dakota Department of Transportation
Pierre, South Dakota                          Attorneys for plaintiff and
                                              appellant.


CLINT SARGENT
RALEIGH HANSMAN
ERIN WILLADSEN of
Meierhenry Sargent LLP
Sioux Falls, South Dakota                     Attorneys for defendants and
                                              appellees.

* * * *

ARGUED
MARCH 25, 2025
OPINION FILED **02/18/26**

#30723

DEVANEY, Justice

[¶1.]     In August 2020, the State of South Dakota commenced an action to condemn certain private property in conjunction with the reconstruction of the Interstate 29 (I-29) and 41st Street interchange in Sioux Falls (the Project).  To complete this Project, the State deemed it necessary to acquire a portion of private property owned by Charles and Heather Gustafson.  Their property abuts Carolyn Avenue and is located at the northwest quadrant of the intersection of 41st Street and Carolyn Avenue.  The State paid the Gustafsons compensation for the fair value of the parts of their property taken for a permanent easement and a temporary construction easement.

[¶2.]     The Project also provided for the closure of the 41st Street and Carolyn Avenue intersection, which eliminated the shortest indirect access route to the Gustafsons' property from 41st Street.  The Gustafsons claim the loss of that access is compensable, while the State maintains it is not.  After a court trial on the issue of compensability, the circuit court determined that the Gustafsons had a special right of access to 41st Street via this intersection, that the closure of this intersection substantially impaired their right of access, and that they sustained an injury peculiar to their property.  On these bases, the circuit court concluded the loss of access to and from 41st Street via the Carolyn Avenue intersection is compensable.  The State appeals this determination.  We reverse.

### Factual and Procedural Background

[¶3.]     The Gustafsons' property that is the subject of this appeal consists of two contiguous parcels—Parcel 37 and Parcel 37A.  The southern border of their

-1-

property abuts the 41st Street interchange right-of-way and the eastern border abuts Carolyn Avenue.



**Picture 4**

Looking north at Parcel 37 and 37A (Larger Parcel)

[¶4.]      The Gustafsons' property was previously owned by Lloyd and Lillian Eagan who, in 1958, entered into an option agreement with the State for the State's acquisition of a portion of their property to construct a controlled-access highway—I-29, which included the interchange at 41st Street. At that time, this was a rural area. What is now 41st Street was a section line gravel road and what is now Carolyn Avenue was a township gravel road that ran north from the section line road. The other streets that currently intersect with Carolyn Avenue at various points to the north of 41st Street did not exist at that time, and the only way the Eagans could access the section line road (now 41st Street) after the construction of I-29 was through the Carolyn Avenue intersection.

[¶5.]      The Gustafsons purchased Parcel 37 in 1982 and purchased Parcel 37A in 2003. For several years, the Gustafsons leased Parcel 37 to NPC, a national

retailer of Pizza Hut restaurants. Tenants of the Gustafsons' property also included a foot surgical center, a hair salon, a cannabis business, a gentlemen's club, and a foundation that provides service dogs.

[¶6.]    In August 2020, the State filed a petition, pursuant to SDCL ch. 31-19, seeking a judgment condemning a portion of the Gustafsons' property. The State alleged that as part of the current Project modifying the 41st Street interchange, it was necessary to acquire part of the Gustafsons' property as a right of way and for construction easements. The State sought a permanent taking of a portion of the Gustafsons' property, as well as temporary easements across it. The State alleged the "just compensation for the acquisition and all damages" was estimated to be $540,300.

[¶7.]    Relevant here, the plans and specifications for the Project called for the closure of the Carolyn Avenue intersection, the conversion of Carolyn Avenue to a dead end street, and the construction of a cul-de-sac at its southern end.[1] The shortest route for travelers on 41st Street—a very busy corridor surrounded by many retail businesses and restaurants—to access the Gustafsons' property is by turning north onto Carolyn Avenue, then driving approximately 200 feet before turning left into the property's parking lot. After the closure of the Carolyn Avenue intersection, access to the Gustafsons' property from 41st Street is less direct. A driver on 41st Street must now turn north onto Shirley Avenue, a street running

---

1.    Safety concerns were the main reason for the closure of the Carolyn Avenue intersection. According to an engineer who testified for the State, there is a high history of crashes at this intersection. She explained that with the Project's reconfiguration of the interchange, the intersection would be within a dedicated right-turn lane, which is not allowed and very unsafe.

parallel to Carolyn Avenue to the east, turn west onto 38th Street, and then south onto Carolyn Avenue, before turning into the entrance points to the property.

[¶8.] In the course of the condemnation process, the State had the Gustafsons' property appraised. The appraisal notes that the "redesign of the 41st Street & Carolyn Avenue intersection will cause significa[nt] changes to the Remainder Parcel and neighborhood as a whole." The appraisal contains a list of the specific changes that may be compensable, and notes that changes pertaining to the increased travel distance from 41st Street, circuity of travel, and the highest and best use of the property are non-compensable.

[¶9.] The Gustafsons, however, believe these changes are compensable. They moved for partial summary judgment on the issue of the compensability for loss of the existing access to 41st Street via the Carolyn Avenue intersection. They asserted that they had a protected special right of access, through this intersection, as abutting landowners. In support, they claimed that based on a 1963 plat of Parcels 37 and 37A recorded by their predecessors, the Eagans, their property extends to the center of Carolyn Avenue and thus abuts the intersection. They further noted that when the State acquired property from the Eagans to build I-29, the 1958 project plans showed this intersection would remain open as an access point, and claimed the State mitigated the damages it would otherwise have owed to the Eagans if it had been closed. They argued they are now entitled to compensation for the closure of the intersection.

[¶10.] The State disputed the Gustafsons' claim that they have a constitutionally protected special right of access to 41st Street through the Carolyn

Avenue intersection. The State noted that in 1958, it acquired control of all access between the Eagans' property and I-29, including the 41st Street interchange, when the Eagans conveyed the strip of property across their entire southern border for the construction of this controlled access highway. The State argued there is no evidence that the State mitigated a compensable element of damage at that time, noting the language in the option agreement that stated the Eagans were fully compensated "for all damages of every kind and nature" relating to the remainder property, and that they relinquished all access rights they would otherwise have between their property and the abutting 41st Street interchange. The only access retained in the option agreement was that which could be granted at the option of the State through any frontage or service road within the boundaries of the existing or later acquired right-of-way the State may construct in the future, and no such road was ever constructed. As a result of the 1958 acquisition, the State asserted that the Gustafsons have never had a special right of access to 41st Street.

[¶11.]     The State further noted that while the only existing access to and from the Eagans' property in 1958 was through the Carolyn Avenue intersection, after I-29 was constructed and this area continued to develop, numerous alternative access routes to and from the Eagans' property via Carolyn Avenue were later constructed. Because other routes allowing access to surrounding roads are now available to the Gustafsons, the State asserted they are not entitled to compensation for a loss of access via the Carolyn Avenue intersection. The State additionally argued that the Gustafsons cannot prove they are entitled to "special damages" for loss of this access because there is no injury stemming from the

closure of this intersection that is different in kind from that suffered by the traveling public.

[¶12.]    The circuit court denied the Gustafsons' motion for partial summary judgment and held a court trial on the issue of compensability of the Gustafsons' claimed loss of access.  At trial, Joel Gengler, the State Department of Transportation's Right of Way Program Manager, explained that both I-29 and the 41st Street interchange are controlled-access facilities, and the State has the right to preclude access between the required right-of-way for such facilities and the neighboring roadway.  He testified that the 1958 project involving the construction of I-29 did not include control of access across the Carolyn Avenue intersection. Gengler explained that after the construction of I-29, the only existing access from the Eagan property to and from a larger section of street networks was through this intersection.  He agreed that if the Eagans' only access to a system of roads would have been taken in 1958, compensation would have been due.  However, he did not agree that the Eagans' right to access via this intersection would be considered a "special" right because it was an intersection available to all property owners along the township road that later became Carolyn Avenue.

[¶13.]    Gengler also refuted the Gustafsons' claim that their property boundary extended to the center of Carolyn Avenue.  He testified that an abstract of the history of Carolyn Avenue showed that this road was expressly dedicated to the public for use as a public road.  His conclusion was based on several deeds, a 1944 plat dedicating what was then called "Project Road" for use as a public road, and a

resolution passed by the "Village of South Sioux Falls" accepting this dedicated road as part of the village street system and agreeing to improve and maintain it.

[¶14.] To support the Gustafsons' compensation claim, Charles Gustafson testified about the future redevelopment plans he had for the property, including tearing down existing buildings and constructing new ones in an attempt to attract a national retailer. He indicated those plans are no longer feasible given the closure of the Carolyn Avenue intersection and the loss of the more direct access to and from 41st Street for customers of such prospective businesses.

[¶15.] According to Charles, in 2017, prior to the closure of the Carolyn Avenue intersection, NPC terminated Pizza Hut's lease, due in part to the anticipated Project but also for reasons unrelated to the Project. He testified that prior to the Project, he had engaged in discussions with Chick-fil-A about a sale or redevelopment of the property, but when Chick-fil-A learned of the plan to close the Carolyn Avenue intersection, discussions ceased. Charles also testified that prior to the Project, he maintained short-term leases with many of the businesses on the property so he could keep his options open for future redevelopment of the property. Charles acknowledged, however, that some of the current tenants are "destination" businesses that are less dependent on high traffic and convenient access. He also acknowledged that even prior to the Project, the property did not have direct access to 41st Street. The only direct access to the property has always been through access points on Carolyn Avenue. Charles admitted that while access to and from 41st Street is not as convenient after the closure of the Carolyn Avenue intersection, the property is still accessible via other routes.

[¶16.]     The Gustafsons also presented testimony from two local real estate agents regarding the property's desirable location given its high visibility and convenient access from 41st Street. They testified that the highest and best use for the property is high density commercial businesses, such as national restaurant tenants who would pay a high premium for such a location. Both were of the view that the closure of the Carolyn Avenue intersection would cause a substantial impairment in access for such businesses, thus making the property less marketable to these prospective high-dollar tenants.

[¶17.]     In their post-trial briefs, the Gustafsons reasserted the two bases on which they had unsuccessfully sought a partial summary judgment—(1) that their property extends to the center of Carolyn Avenue, so they have a special private right to access 41st Street as abutting landowners, and (2) that they retained a special private right, via their predecessors (the Eagans), to access 41st Street through the Carolyn Avenue intersection because it was a feature of the 1958 construction project that was later closed. They also asserted an alternative claim in the event the court found they do not have a special private right of access through this intersection. They claimed the closure of the intersection resulted in a substantial impairment of access, unique to their property, for which they are entitled to severance damages.

[¶18.]     In response, the State argued that the evidence at trial proved that Carolyn Avenue was dedicated to the public and accepted by the City as a public roadway and that the Gustafsons are not, therefore, landowners abutting the Carolyn Avenue intersection. The State also refuted the Gustafsons' claim that the

compensation the State paid to the Eagans was reduced due to a special benefit of the 1958 project, noting that there is no indication in any of the acquisition documents related to the State's purchase of the Eagans' property to support this claim. The State further maintained that the Gustafsons' claim of substantial impairment of access as a result of the closure of this intersection is not supported by the governing case law from this Court, nor is there support for their claim that they suffered an injury that is different in kind from that incurred by other landowners and the traveling public.

[¶19.] The circuit court, in its findings of fact and conclusions of law, rejected the Gustafsons' claim that they have a special right of access to the Carolyn Avenue intersection as abutting landowners, concluding that under SDCL 11-3-12, "the 1944 plat dedicating Carolyn Avenue gave the public fee title to this right of way for public highway purposes" and such "right of way has not been vacated or abandoned." The Gustafsons have not appealed this determination.

[¶20.] However, the circuit court determined the Gustafsons were entitled to compensation for loss of access based on their other two asserted grounds. The court acknowledged that the Eagans relinquished all their rights of access "between the I-29 project" and their "abutting, adjacent or adjoining real property." But the court found that the 1958 construction plans for I-29 showed that the "intersection at what is now 41st Street and Carolyn Avenue would remain as part of the project[,]" and noted that in 1958, this was the Eagans' only access route from their property to the system of existing roads. The court further found there "is no evidence to support a conclusion that the Eagans would relinquish all rights to

access their property" from this intersection. On this basis, the court concluded that the Gustafsons, through their predecessors, "retained a special right to access 41st Street through the Carolyn Avenue intersection."

[¶21.] The circuit court further found that "the State mitigated a compensable element of damage (the complete taking of all access to the Eagan property)" by not taking control of access across the existing Carolyn Avenue intersection. The court concluded that when the State subsequently "eliminated that feature" of the 1958 project by closing the Carolyn Avenue intersection as part of its current project, the Gustafsons were entitled to compensation for this loss of access.

[¶22.] As an alternative basis for concluding the Gustafsons were entitled to compensation for the loss of access to the intersection, the circuit court concluded that the change in access to the property "amounts to a substantial impairment of access." The court noted that prior to the Project, the Gustafsons' property was 200 feet from the nearest access to 41st Street via Carolyn Avenue, and that after completion of the Project, traveling to the property from 41st Street through other existing streets involves three changes of direction and a distance of approximately 3,000 feet (just over one-half mile). The court concluded that the circumstances— including the fact that the property had previously been sufficient to support high-volume, high-density retail buyers and tenants and the "substantial increase in circuity of travel"—amounted to a substantial impairment of the property's access. The court also concluded that the injury to the Gustafsons is peculiar to the property and not of a kind suffered by the public generally.

[¶23.]     The circuit court entered a corresponding order stating the Gustafsons could "seek just compensation for any damage caused to any of their remaining property due to the loss of access through the intersection located at 41st Street and Carolyn Avenue."  The parties later stipulated that the amount of compensation due is $1,329,389, plus interest and costs, for a total of $1,510,901 (which includes the amount paid to the Gustafsons for the physical taking, easements, and the loss of the shorter access to 41st Street), subject to the State's right to appeal the circuit court's determination of a compensable taking.  The State appeals, claiming the circuit court erred in determining that the closure of the Carolyn Avenue intersection is compensable.

## Standard of Review

[¶24.]     "[T]he determination whether a property interest was taken or damaged for public use is a question of law for the court."  *State v. Legacy Land Co.*, 2023 S.D. 58, ¶ 19, 998 N.W.2d 94, 100 (quoting *State v. Miller*, 2016 S.D. 88, ¶ 43, 889 N.W.2d 141, 154).  Both the determination of whether a compensable taking has occurred and whether the Gustafsons' access has been substantially impaired are reviewed de novo.  *Schliem v. State*, 2016 S.D. 90, ¶ 10, 888 N.W.2d 217, 222–23 (citing *Rupert v. City of Rapid City*, 2013 S.D. 13, ¶ 29, 827 N.W.2d 55, 67); *Hurley v. State*, 143 N.W.2d 722, 726 (S.D. 1966) (conducting de novo review of determination that landowner's access was substantially impaired).  "Findings of fact are reviewed for clear error and will only be overturned 'when we are definitely and firmly convinced a mistake has been made.'"  *Uhre Realty Corp. v. Tronnes*, 2024 S.D. 10, ¶ 19, 3 N.W.3d 427, 434 (citation omitted).

-11-

**Analysis and Decision**

[¶25.] The South Dakota Constitution provides that "[p]rivate property shall not be taken for public use, or damaged, without just compensation[.]" S.D. Const. art. VI, § 13; *see also Legacy Land*, 2023 S.D. 58, ¶ 19, 998 N.W.2d at 100. When analyzing a claim brought under this provision, the Court must first decide "whether a recognized property right has been infringed by state conduct." *Schliem*, 2016 S.D. 90, ¶ 13, 888 N.W.2d at 224. As it relates to a claim that property has been taken or damaged, we have recognized that "'[a]ccess is a property interest.'" *Legacy Land*, 2023 S.D. 58, ¶ 20, 998 N.W.2d at 100–01 (quoting *Miller*, 2016 S.D. 88, ¶ 42, 889 N.W.2d at 154). However, not all restrictions of access to property constitute a taking:

> [A]n abutting landowner has a right of ingress and egress that pertains, not only to the part of the highway abutting the owner's land, but extends sufficiently beyond his own premises as to insure him reasonable facilities for connection with those highways in which he has no special rights. However, the right of ingress and egress . . . [is] subject to reasonable regulations in the public interest and for the promotion of public convenience and necessity. Where there is no physical taking and the owner's access to the highway on which he abuts is not unreasonably diminished or interfered with, his loss is due to diversion of traffic, a lawful exercise of the police power and there can be no recovery.

*Id.* (citation omitted). Here, the circuit court concluded the Gustafsons were entitled to compensation for the loss of a particular route of access to 41st Street on alternate bases, each of which we address in turn.

### 1.    Whether the Gustafsons have a special right of
### access to 41st Street as abutting landowners.

[¶26.]    To the extent the circuit court determined that the Gustafsons retained a special right of access to 41st Street as abutting landowners, such determination was erroneous.  The Gustafsons have no special right of access to 41st Street because, in 1958, the Eagans relinquished all of their special access rights appurtenant to their property abutting 41st Street when they sold it to the State.  The 1958 option agreement, which incorporated the plans and specifications for the original I-29 project, showed that all of the Eagans' property abutting 41st Street was acquired by the State for the 41st Street interchange right-of-way, and the corresponding warranty deed expressly stated "CONTROLLED ACCESS. . . . No Access."  The circuit court's finding that the option agreement contained "no reference to taking control of access to the section line road that eventually became 41st Street" is clearly erroneous because the entire portion of the Eagans' property that abutted 41st Street became part of the controlled access highway to which they expressly relinquished all rights of access.[2]

[¶27.]    While not clear, this finding by the circuit court may not have been referring to the Eagans' special access rights as abutting landowners, but instead to the right of all property owners to have access to reasonable facilities to connect

---

2.    The Gustafsons also cannot claim a special right of access to the *Carolyn Avenue intersection* as abutting property owners.  After the Eagans' 1958 conveyance to the State, the southern boundary of the Gustafsons' property no longer abutted this intersection, and the circuit court rejected the Gustafsons' claim that the eastern boundary of their property extends to the center of Carolyn Avenue.  Although the Gustafsons have a special right of access to the portion of Carolyn Avenue that does abut their property, such right does not extend to the now-closed Carolyn Avenue intersection.

with a greater system of highways to which they have no special rights. If so, then the pertinent question is whether the Gustafsons, when purchasing the remainder property from the Eagans, retained a special right of access to a greater system of roads via the Carolyn Avenue intersection by virtue of the transaction the Eagans entered into with the State in 1958. The answer to this question hinges on whether the circuit court correctly determined that our prior holding in *Hall v. S.D. Dep't of Transp.* (*Hall II*), 2011 S.D. 70, 806 N.W.2d 217, applies to the circumstances here.

[¶28.] In *Hall II*, this Court considered whether landowners were entitled to compensation for damages resulting from the closure of an exit abutting their property that allowed access to an interstate highway. *Id.* ¶ 10, 806 N.W.2d at 222. The landowners' property abutted former Exit 66 on Interstate 90 (I-90). Part of their property had been taken in 1961 via condemnation for the construction of I-90. At that time, there was no highway where the interstate would be constructed, but part of the project included the construction of the Exit 66 interchange, which afforded the property at issue indirect access to I-90. *Id.* ¶ 4, 806 N.W.2d at 220. The State's appraisal noted that this interchange "would be a 'significant' and 'special benefit' to the property" and that the increase in value to the property would "more than offset the severance damages on the [Property not taken]." *Id.* (alteration in original). The State also determined that the landowners' property was the only property that was "specially benefitted." *Id.* The State thus offset the damages paid for the acquisition of the abutting property in light of this benefit. *Id.* In 2003, the State removed the Exit 66 interchange, and the landowners filed an inverse condemnation action, seeking compensation for damages resulting from the

closure, namely the loss of their business, a Flying J truck stop, which had to cease operations after Exit 66 was removed. *Id.*

[¶29.] *Hall II* presented a question of first impression—whether "an abutting property owner is entitled to compensation for damages when the initial compensation for a physical taking is offset because of the special benefit of access the State indicates the remaining property will be afforded, but that access is later removed." *Id.* ¶ 12, 806 N.W.2d at 223. After reviewing several cases from other states addressing this issue, we determined that a landowner could recover compensation for such loss of access if: "(1) property abuts a proposed controlled-access highway; (2) the state takes a portion of the property in a condemnation proceeding for the highway; (3) the state mitigates some compensable element of damage based on the state's designation of a feature of the project; (4) the state subsequently eliminates that feature; and (5) like any other claim for damages under Article VI, § 13 of the South Dakota Constitution, the landowner can prove special damages." *Id.* ¶ 29, 806 N.W.2d at 228 (citations omitted).

[¶30.] The circuit court concluded that a similar scenario occurred here when the State took a portion of the Eagans' property for the construction of I-29. The court found that in 1958, "the State mitigated a compensable element of damage (the complete taking of all access to the Eagan property) based on the State's designation of a feature of the project (not taking control of access across the [existing] intersection of 41st Street and Carolyn Avenue by delineating that access would remain in that location in the construction plans and plat accompanying the deed of transfer)." The court concluded that the Gustafsons were entitled to

compensation for special damages as a result of the State's subsequent elimination of this intersection.

[¶31.] The circuit court's conclusion is flawed in several respects. Contrary to the scenario here, in *Hall II*, the Exit 66 access was constructed as a part of the I-90 project and deemed a "special benefit" that increased the value of the property not taken, thus mitigating the severance damages owed on the remainder property. *Id.* ¶ 4, 806 N.W.2d at 220. Notably, the cases from other courts we considered before arriving at the five-factor test noted in *Hall II* also involved the *construction or addition of a new* access point. *See Filler v. City of Minot*, 281 N.W.2d 237, 240 (N.D. 1979) (the right of way plat showed three access points to the controlled access highway through a new frontage road abutting the landowners' property); *Johnson Bros. Grocery, Inc. v. State Dep't of Highways*, 229 N.W.2d 504, 505 (Minn. 1975) (a new access opening was created, allowing the abutting landowner access to the new controlled-access highway at a point immediately across from the landowner's property); *Alsop v. State*, 586 P.2d 1236, 1238 (Alaska 1978) (the state's "agreement to build an intersection" on the new highway "was crucial to settlement of [the property owner's] condemnation claim"); *State ex rel. Herman v. Tucson Title Ins. Co.*, 420 P.2d 286, 287 (Ariz. 1966) (the state constructed an interchange allowing access from the landowner's remaining property to the controlled access highway).

[¶32.] Here, there was no evidence of the construction of a new access that could be deemed a "feature" of the 1958 project. And, even if the mere depiction of an existing intersection on the plat and construction plans for the project could be

deemed a feature of the project, there is no evidence in the record, like the State's appraisal in *Hall II*, showing that the value of the Eagans' remainder property would increase if this intersection was not closed. Thus, there is no evidence that the damages the State paid to the Eagans were in any way mitigated because of a special benefit. These elements were critical to our conclusion that the *Hall II* plaintiffs were entitled to compensation after the feature deemed a "special benefit" was later removed. *Hall II*, 2011 S.D. 70, ¶ 30, 806 N.W.2d at 228.

[¶33.] Instead of noting this lack of evidence, the circuit court entered a finding based on an assumption that the Eagans did not "relinquish all rights to access their property" via this intersection. Such assumption is misplaced because the Eagans were never asked to do so. The existing intersection allowing them indirect access to the section line road was left as is. More importantly, the court did not, nor could it, enter a finding stating that the State, in 1958, left the intersection open as a *special benefit* to the Eagans which *offset* the damages otherwise owed for the remainder property because there was *no evidence* of such offered at trial. The court's generic conclusion, more appropriately characterized as a finding, that the "State mitigated a compensable element of damage" by not taking control of this intersection was not only unsupported by any record evidence, it is also contrary to the express language in the option agreement and warranty deed.

[¶34.] In those documents, the Eagans relinquished all rights to access between the controlled access highway, which included the 41st Street interchange, and their property. The only exception noted in the option agreement was an

express reservation of the right of direct access to any frontage or service road the State may construct in the future. The Gustafsons nevertheless point to Gengler's testimony that if the Carolyn Avenue intersection had been closed in 1958, the Eagans would have been entitled to compensation for such closure because this intersection was the only way to access the larger system of streets from the Eagans' property. However, there was no mention in the option agreement of a reservation of a special right to continued indirect access to the section line road, which then became the 41st Street interchange, through this existing intersection.[3]

[¶35.] The option agreement also notes that $6,330 was paid to the Eagans "to cover all right of way and damages." A portion of that amount ($4,206.60) was for the 11.017 acres of land physically taken, and $2,123.40 was for "[d]amages of every kind and nature." The option agreement specified that the payment of $6,330 was "full and ample consideration for [the Property], all other controlled-access facilities and any and all damages as a result of said easement and highway construction, maintenance and operation." There was no mention in any of the documents admitted at trial of an offset due to a "special benefit," a term that *Hall II* notes "follows the distinction between general and special damages." 2011 S.D. 70, ¶ 34, 806 N.W.2d at 230 (citations omitted) (noting that "special damages" are those that are "different in kind and not merely in degree from that experienced by the general public"). Indeed, leaving open an existing access to a section line road

---

3. The State expressly reserved the right to control all access to this controlled access highway in the option agreement. *See* SDCL 31-8-6 ("No person has any right of ingress or egress to, from or across any controlled-access facility to or from any abutting land, except at any designated point at which access may be permitted.").

used by all the traveling public could not be deemed a "special benefit." Because of the lack of any evidence of the Eagans' compensation being mitigated due to a feature of the project specially benefiting them, there is likewise a lack of evidence to support the circuit court's conclusion that the Gustafsons suffered "special damages" when the existing intersection was later closed in conjunction with the current project. For all the above reasons, the court erred in concluding that the Gustafsons had a special right of access to 41st Street via the Carolyn Avenue intersection.

### 2. Whether the Gustafsons are entitled to compensation for a substantial impairment of access.

[¶36.] As an alternative basis for determining the Gustafsons are entitled to compensation, the circuit court concluded that "[e]ven if the Gustafsons did not have a special right of access as abutting landowners, the change in access as part of the current project amounts to a substantial impairment of access[.]"[4] As inverse-condemnation claimants, it was the Gustafsons' burden to prove that the closure of the Carolyn Avenue intersection resulted in a substantial impairment of

---

4.    When entering its findings on this issue, the circuit court included a finding that the substantial impairment of access was caused by a physical taking of the Gustafsons' property. The court did not elaborate on the basis for this finding. Here, there was no *physical taking* of the Gustafsons' property directly related to the closure of the Carolyn Avenue intersection. The circuit court determined the Gustafsons have never owned any part of Carolyn Avenue, a dedicated public street, and they have not appealed this ruling. While the State physically took a portion of their property to construct a cul-de-sac because the closure of the intersection resulted in Carolyn Avenue becoming a dead-end street, the State did not have to acquire any of the Gustafsons' property to close the *intersection*. The circuit court clearly erred to the extent it concluded otherwise.

access *and* that their *"injury is peculiar to [their] property and not of a kind suffered by the public as a whole."* *Legacy Land*, 2023 S.D. 58, ¶ 38, 998 N.W.2d at 104 (citation omitted). In concluding that the Gustafsons established both elements, the circuit court strayed from our well-established principles regarding what constitutes a substantial impairment of access and special damages.

[¶37.] When concluding that the Gustafsons satisfied both requirements, the circuit court did not focus on impairment of *access*. Instead, the court focused on the impairment of the *highest and best use* of the Gustafsons' property and the corresponding loss of prospective earnings from more lucrative tenants, neither of which are *constitutionally protected property rights* that may be considered when determining whether an inverse-condemnation plaintiff is entitled to compensation. And although the court deemed this an alternative ruling, its determination that there is a substantial impairment and unique injury here was incorrectly based, not on the Gustafsons' general right of access to a larger system of streets, but instead on their perceived right of access to 41st Street, a street to which they have no special right of access. When properly oriented to our governing law, both of the court's conclusions are unsustainable.

[¶38.] As a starting premise, this Court has, on several occasions, explained that property owners do not have a right to unrestricted access to their property, but only to *reasonable* access. For example, in *Darnall v. State*, the Court considered the property owners' claim, similar to the Gustafsons' claim here, to an "unrestricted right of direct access to their business establishment." 108 N.W.2d 201, 205 (S.D. 1961). There, in conjunction with the State's construction of a

portion of I-90 as a controlled-access highway near Piedmont, South Dakota, the

State installed a curb and gutter on the east side of a two-lane blacktop highway

(U.S. Highway 14/State Highway 79).  *Id*. at 202.  The plaintiffs owned three lots

along this highway, containing a café, two cabins, and a gas pump.  Prior to the

construction of I-90, the plaintiffs' property could be accessed directly from the

highway.  With the addition of the curb and gutter, however, that direct access was

eliminated and the plaintiffs' lots could be accessed from either of two interchanges,

each a mile from plaintiffs' property.  The plaintiffs claimed their right to direct

access was a property right that was taken or damaged by the State, for which the

plaintiffs deserved compensation.  *Id*.

[¶39.]     In considering that claim, the Court noted:

> In the case at bar[,] no part of the highway used by motor
> vehicles was closed or interfered with; two-lane traffic in both
> directions may still continue on it as before.  Plaintiffs have the
> same access to the system of highways, including the Interstate
> as the general public.  Their only complaint is that they do not
> have direct and immediate access to the new Interstate
> Highway; and inversely, that travelers on it do not have the
> unrestricted right of direct access to their business
> establishment.  Motor vehicles traveling in a northerly direction
> in the east segment of the Interstate are now prevented from
> direct access to plaintiffs' property; this results from the
> separation of the two roads by a ditch and a regulation requiring
> northbound vehicles to travel on it.  Such traffic may reach
> plaintiffs' property by use of either interchange; this requires
> circuity of travel.  Circuity of travel is not a compensable
> damage under these circumstances; it is a burden shared by all
> the traveling public.

*Id*. at 205.  Importantly, the Court held that the "construction of a highway past a

place of business gives owners no vested right to insist that it remain there as a

changeless road in a changing world" and that no legal damage results when traffic is diverted and a property owner suffers an incidental loss. *Id.*

[¶40.]      More specifically, the Court in *Darnall* noted the "right of ingress and egress" is "subject to reasonable regulations"—in other words, the right of access is for "reasonable or convenient access and not access at all points along the highway." *Id.* at 205–06 (citations omitted). We therefore held that "[w]hile they may adversely affect an established business, relocations of a highway, prohibitions against crossing it or against left and U turns, the designation of one-way streets and other similar restrictions and regulations . . . are not compensable." *Id.* at 206 (citations omitted). In short, we concluded that when a property owner's "access to the highway on which he abuts is not unreasonably diminished or interfered with, his loss is due to a diversion of traffic, a lawful exercise of the police power and there can be no recovery." *Id.* at 207. We have repeatedly adhered to this principle.

[¶41.]      More recently, in *Schliem*, a case bearing many similarities to the one here, we considered a property owner's claim for compensation as a result of a loss of a more direct route to a high-traffic street leading to and from I-90. 2016 S.D. 90, ¶¶ 2–3, 888 N.W.2d at 219–20. Schliem, the plaintiff, owned property in Sioux Falls near the Cliff Avenue and I-90 interchange. In connection with the reconstruction of a portion of I-90 and Cliff Avenue, the State closed the Cliff Avenue intersection that connected to 63rd Street, a street running east from Cliff Avenue and abutting Schliem's property. The distance from the property to the Cliff Avenue intersection was approximately 748 feet. It was Schliem's intention to commercially develop the property around an anticipated new hotel. He argued

that he had a property right "in direct access to the [i]ntersection and that by closing [it], 'the State's project destroyed 100% of the commercial accessibility' to the Property[,]" which he claimed, "diminished the market value of the Property by $313,800." *Id.* ¶ 8, 888 N.W.2d at 221.

[¶42.]    In rejecting Schliem's claim, we explained:

> Our cases establish that "the owner of land [has a special, private right] to access [his] land . . . where it abuts upon a highway." This right "extends sufficiently beyond his own premises as to insure *him reasonable* facilities for connection with [nonabutting] highways[.]" Thus, "[p]roperty ownership includes two access related rights: the right to pass to or from the public way immediately adjacent to the land ('ingress and egress'); and the right to go somewhere else once the owner is upon the abutting road, or the right of access to the entire system of roads." Except for the right to access an abutting highway, "the law . . . does not protect any particular access route[.]" "The right of access is unimpaired if an alternative means of reasonable access exists."

*Id.* ¶ 16, 888 N.W.2d at 226 (alterations in original) (citations omitted). We noted that Schliem's property did not abut Cliff Avenue or the intersection, but only abutted 63rd Street. We thus concluded that "contrary to Schliem's contention, he does not have a right of access to the [i]ntersection per se; instead, he is simply entitled to reasonably convenient access to the system of public highways." *Id.* ¶ 16, 888 N.W.2d at 227.

[¶43.]    In so concluding, we held:

> Not every change in access to the system of public highways is unreasonable such that a property owner is entitled to compensation. The right of access is infringed in the constitutional sense only when it is destroyed or *substantially* impaired. "Courts uniformly agree that *a reduction in value resulting from 'diversion of traffic'* is noncompensable, as is 'mere circuity of travel.'" Although "[m]ost directional traffic regulations, by their very nature, involve mere diversion of

-23-

> traffic and circuity of travel[,]" . . . some may nevertheless result in a substantial impairment of access. For example, "[g]overnmental activity that totally landlocks a parcel which previously had access is a taking of property." Likewise, substantial increases in circuity may be compensable.

*Id.* ¶ 17, 888 N.W.2d at 227 (citations omitted). We further noted that "changes in the physical dimensions and conditions of access may also amount to a substantial impairment." *Id.* As an example of physical changes that could constitute a substantial impairment, we cited *City of Waco v. Texland Corp.*, 446 S.W.2d 1, 4 (Tex. 1969), and noted that in that case, the installation of support piers for an overpass narrowed the existing street, which substantially impaired the property owner's access to its industrial property by preventing the use of transport trucks. *Schliem*, 2016 S.D. 90, ¶ 17, 888 N.W.2d at 227. We contrasted that scenario with Schliem's, noting that his access to 63rd Street, which his property abutted, was not affected by the closure, and the physical characteristics of his access routes before and after the closure of the Cliff Avenue intersection did not change, as both were unimproved gravel roads. *Id.* ¶ 18, 888 N.W.2d at 228.

[¶44.] We then compared the distances Schliem had to travel before and after the closure of the intersection to connect to "the general system of public highways"—748 feet west on 63rd Street to connect to Cliff Avenue, versus 834 feet east on 63rd Street to connect to the nearest alternative connecting highway—a difference of only 86 feet. *Id.* We noted that the "increase in circuity of only 86 feet (or about 0.0163 mile) is substantially less than increased circuity held to be noncompensable in other cases." *Id.* (citing *Darnall*, 108 N.W.2d at 202) (holding a one-mile diversion is noncompensable); *Triangle, Inc. v. State*, 632 P.2d 965, 967

(Alaska 1981) (holding one-half-mile diversion noncompensable); and *Ark. State Hwy. Comm'n v. Bingham*, 333 S.W.2d 728, 729 (Ark. 1960) (holding a diversion of more than one mile noncompensable)). Based on these circumstances, we concluded the closure of the Cliff Avenue intersection "did not substantially impair Schliem's general right of access to the system of public highways, and any inconvenience occasioned thereby is not compensable." *Schliem*, 2016 S.D. 90, ¶ 18, 888 N.W.2d at 228.

[¶45.]    Notably, Schliem's claim that the closure of the Cliff Avenue intersection destroyed the commercial accessibility to his property and would cause the market value of his property to drastically decrease played no part in our analysis of whether he suffered a substantial impairment of access. In fact, we emphasized in *Schliem* that "a landowner is not entitled to compensation under Article VI simply because he has suffered some loss or his property has been devalued as a result of state action. 'A property right must be invaded before compensation is allowed.'" *Id.* ¶ 14, 888 N.W.2d at 224 (citing *Darnall*, 108 N.W.2d at 207). "When a recognized property interest has not been infringed, '[t]here is no redress, as there is no wrong to redress, *though the [loss] may be great in dollars and cents*.'" *Id.* (citing *Hyde v. Minnesota, D. & P.R. Co.*, 136 N.W. 92, 97 (S.D. 1912)).

[¶46.]    Here, the circuit court's conclusion that the intersection closure caused a substantial impairment to the Gustafsons' property was based on the same claims we rejected in *Schliem* and *Darnall*, namely that the loss of a shorter access route to 41st Street "will destroy the high-volume, high density retail character of the

property." Although the circuit court also included a conclusory statement referring to "physical dimensions and conditions of access," it made no findings explaining what these are. Charles Gustafson admitted at trial that the property retained direct access to and from Carolyn Avenue, and there is no dispute that the other available intersections and connecting streets along Carolyn Avenue could accommodate all types of vehicular traffic.

[¶47.] The circuit court also referred to "increases in circuity of travel" as a basis for its substantial impairment conclusion, relying on isolated statements from *State v. Miller* as support for this basis instead of applying our analysis and holding in *Schliem*. *Miller* was a companion case to *Schliem*, involving other landowners similarly impacted by the closure of the Cliff Avenue and 63rd Street intersection. 2016 S.D. 88, ¶¶ 4–5, 889 N.W.2d at 144. While we recited the same general principles as those in *Schliem*, we never had to apply them in *Miller* because the case was remanded to the circuit court to determine whether there was a substantial impairment in access. *Id.* ¶ 47, 889 N.W.2d at 157.

[¶48.] The circuit court focused on our statement in *Miller* that when determining whether there has been a substantial impairment of access, a court "may consider circumstances such as the nature of the property involved, the character of the access before and after governmental activity, and the location (rural or urban)." *Id.* ¶ 44, 889 N.W.2d at 156. However, the discussion in *Miller* that follows makes it apparent that we were not referring to the highest and best use of the property when referring to the "nature of the property" as a consideration when determining compensability. Instead, we further explained that the right to

access may be substantially impaired "[where] *access* for which the property was specifically intended [has been] rendered . . . deficient," relying on a Texas case, *State v. Dawmar Partners, Ltd.*, 267 S.W.3d 875, 879 (Tex. 2008). *Id.* (alterations in original) (emphasis added).

[¶49.]    The court in *Dawmar* specifically held that the remaining access is analyzed "in light of the actual or intended uses of remainder property *as reflected by existing uses and improvements*" and not based on "speculative or hypothetical uses." 267 S.W.3d at 879 (emphasis added) (citations omitted). *Dawmar* relied in part on the *Texland* case we cited in both *Schliem and Miller*, which likewise focused on the *existing* use and access needs for semi-trucks that frequented the property. 446 S.W.2d at 4 (noting that after the construction of the viaduct over the abutting street it was "most difficult, if not impossible . . . to maneuver a truck that would normally be in use, reasonably several times a day").

[¶50.]    Importantly, in *Dawmar*, the landowners argued that "access is materially and substantially impaired, as a matter of law, when loss of access changes the highest and best use of the property." 267 S.W.3d at 878. The Texas Supreme Court expressly rejected that contention, stating, "[i]f we were to accept this proposition, it would be a rare case in which a reduction of access would not have some impact on the value of property, and the 'material and substantial' limitation would be effectively eliminated in the vast majority of cases, contrary to our body of impaired access law. . . . We reject an analysis that would effect such a result." *Id.* (citations omitted). The court then explained that while a change in the highest and best use of property is not relevant to whether there has been a

substantial impairment of access, it is relevant to the amount of damages in the event such impairment is shown. *Id.* The court also declined to impose a requirement that there be a degree of direct access to an arterial street "because it would be inconsistent with [the court's] well-developed case law regarding circuity of travel." *Id.* at 880.

[¶51.] In *Schliem*, we likewise clarified that highest and best use is not a consideration for whether there has been substantial impairment of access and we rejected a contrary argument:

> The dissent makes a similarly erroneous argument by claiming that "[i]n *Hurley*, this Court considered a property's highest and best use when determining whether a substantial impairment occurred." This claim is factually incorrect. We did not use the change in highest and best use of the property as a basis for concluding a taking had occurred; rather, we referenced the highest and best use in stating the method for calculating the resulting compensation due.

2016 S.D. 90, ¶ 15 n.13, 888 N.W.2d at 226 n.13 (distinguishing *Hurley*, 143 N.W.2d at 726). Accordingly, the Gustafsons' expert opinions regarding the highest and best use of the property or suitability for some future use of the property are not relevant considerations to whether there has been substantial impairment of access. The circuit court erred in relying on this testimony in this manner.

[¶52.] The circuit court also erred in determining that "substantial increases in circuity of travel" was a factor supporting a finding of substantial impairment of access. In reaching this conclusion, the court considered the increased distance via an alternative route to access 41st Street after the closure of the Carolyn Avenue intersection. In *Schliem*, we did not consider the additional distance to access Cliff Avenue via a different route after the closure of the intersection at Cliff Avenue and

63rd Street because Schliem had no special right of access to Cliff Avenue or this intersection. 2016 S.D. 90, ¶ 18, 888 N.W.2d at 228. Instead, we considered the additional distance he would have to travel to the nearest *alternative* street "*to reach the general system of public highways.*" *Id.* (emphasis added). Likewise, here, the circuit court should not have focused on the change in distance from the Gustafsons' property to 41st Street because the Gustafsons had no special right of access to 41st Street or to the Carolyn Avenue intersection. The correct and only comparison connected to a *property right* is the difference between the distance from their property to the intersection of Carolyn Avenue and 41st Street and the distance from their property to the intersection of Carolyn Avenue and 38th Street, the nearest connecting street affording access to the larger system of surrounding streets. This comparison shows the access increased from 200 feet to 800 feet. This 600-foot increase in the length of travel to access a greater system of streets from the Gustafsons' property is marginal, at best. *See id.* (citing cases finding diversions of a half mile to a mile to be noncompensable); *Legacy Land*, 2023 S.D. 58, ¶ 19, 998 N.W.2d at 100 (holding there was no substantial impairment where alternative routes for trucks and semi-tractor-trailers involving additional turns and distances of less than a mile or approximately 1.3 miles were available).[5]

[¶53.] The circuit court's determination of compensability was ultimately centered on a diversion of traffic that may impact the ability of the Gustafsons to attract higher dollar tenants for their property. Such ruling is flatly contrary to our

---

5. Even the circuit court's calculation of an additional 3000 feet (approximately a half-mile) of travel to access 41st Street via a different route would not be deemed compensable based on these prior rulings.

long-held rule that, aside from a special right held by an abutting landowner, there is no property right that would entitle one to compensation from the State in an inverse condemnation action for a diversion of traffic.[6]

[¶54.]     Here, as in *Legacy Land*, *Schliem*, and *Darnall*, there exists alternative routes of access to the Gustafsons' property, routes that are unhindered by structures or other impediments. As such, the availability of these alternative routes for all types of vehicular traffic, which are neither significantly longer nor circuitous, refutes the Gustafsons' claim that access has been substantially impaired. We conclude, therefore, that the circuit court erred in determining the Gustafsons established substantial impairment of access.

---

6.     The dissenting opinion suffers from the same fatal flaws as the circuit court's opinion below. The dissent begins with the faulty premise that the Gustafsons have a special right of access to 41st Street. For all the reasons explained in our analysis of Issue 1, they do not. Second, the entire analysis following this faulty premise collapses when not properly oriented to the only property right at issue. For example, in direct contradiction to this Court's analysis in *Schliem*, where the exact same arguments and comparisons the Gustafsons make here were rejected, the dissent erroneously compares the difference in access routes to 41st Street before and after the Project, rather than the difference in access to the nearest street affording access to a greater system of highways. *See Schliem*, 2016 S.D. 90, ¶ 18, 888 N.W.2d at 228. Finally, the dissent concedes that the Gustafsons' impairment *in access* is not peculiar to their property, as it is an injury suffered by the public in general. The dissent claims this is just "one element of the injury" and refers to the "loss of the high density, retail character" of the Gustafsons' property. This same argument was also addressed and rejected in *Schliem*. *See id.* ¶ 15 n.13, 888 N.W.2d at 226 n.13 (rejecting the argument that a property's highest and best use is a relevant consideration when considering whether there is a compensable impairment of *access*).

### 3. *Whether the Gustafsons established that the injury is peculiar to their property.*

[¶55.]    Even if there were a substantial impairment of access to the Gustafsons' property, they have not proven that such impairment "is peculiar to [their property] and not of a kind suffered by the public generally." *Schliem*, 2016 S.D. 90, ¶ 19, 888 N.W.2d at 228 (citation omitted).  In support of its conclusion that the Gustafsons were specially damaged, the circuit court noted just one finding of fact—"the State has eliminated a designated access point it agreed to provide in 1958."  However, as we concluded above, there was no evidence of a mitigation of damages due to a feature of the 1958 project specially benefiting the Eagans; therefore, the Gustafsons do not have a retained special right of access to 41st Street via the Carolyn Avenue intersection.  The circuit court erred in concluding that the Gustafsons were uniquely harmed by the closure of the intersection on this basis.

[¶56.]    Moreover, the factors that are relevant to whether there has been substantial impairment to access—the length and circuity of travel—are not peculiar to the Gustafsons.  As we explained in *Schliem*, "[l]and that does not directly abut the discontinued roadway and which is still accessible by other public roadways is not specially damaged." *Id.* (citation omitted).  Here, the traveling public, as well as other property owners in this area, will experience the same kind of perceived impairment of access as a result of the Carolyn Avenue intersection closure, although perhaps different in degree. *See Legacy Land*, 2023 S.D. 58, ¶ 39, 998 N.W.2d at 104–05 (noting that "all drivers and landowners along this particular portion of Catron Boulevard must deal with the median"); *Darnall*, 108 N.W.2d at

205 (holding "[c]ircuity of travel is not a compensable damage under these circumstances; it is a burden shared by all the traveling public."); *Schliem*, 2016 S.D. 90, ¶ 19, 888 N.W.2d at 229 (citations omitted) (concluding that because "Schliem's land does not abut the discontinued intersection, and the Property remains accessible from the east[,]" Schliem's loss is "different . . . merely in degree from that experienced by the general public."). Because any impairment to the Gustafsons' property is not unique in kind as compared to the general public, the circuit court erred in concluding they had proven special damages.

## Conclusion

[¶57.] In sum, the Gustafsons had no special right of access to 41st Street or to the continued use of the Carolyn Avenue intersection. While they are entitled to reasonable access to and from their property and to a greater system of roads, they failed to demonstrate a substantial impairment of this right of access or that they suffered special damages resulting from the closure of this intersection. The circuit court, therefore, erred in concluding that this closure was compensable.

[¶58.] Reversed.

[¶59.] JENSEN, Chief Justice, and SALTER, Justice, concur.

[¶60.] MYREN, Justice, and KERN, Retired Justice, dissent.

[¶61.] GUSINSKY, Justice, not having been a member of the Court at the time this action was considered by the Court, did not participate.

KERN, Retired Justice (dissenting).

[¶62.] I respectfully dissent. I agree with the majority's conclusion in Issue 1, but I would affirm the circuit court's finding that the Gustafsons suffered a

"substantial impairment" of their ownership interest when their access to 41st Street was eliminated.

[¶63.]     "Our cases establish that 'the owner of land [has a special, private right] to access [his] land . . . where it abuts upon a highway.'" *Schliem v. State*, 2016 S.D. 90, ¶ 16, 888 N.W.2d 217, 226 (alterations in original) (citation omitted). "This right 'extends sufficiently beyond his own premises as to insure *him reasonable* facilities for connection with [nonabutting] highways[.]'" *Id.* (alterations in original) (citation omitted).  Property ownership therefore includes two access-related rights: "the right to pass to or from the public way immediately adjacent to the land ('ingress and egress'); and the right to go somewhere else once the owner is upon the abutting road, or the right of access to the entire system of roads." *Id.* (quoting 8A Patrick J. Rohan & Melvin A. Reskin, *Nichols on Eminent Domain* § G16.03 [2][a] (3d ed., rel. 109-5/2013)).

[¶64.]     Though not every diversion in traffic or change in access entitles an owner to compensation, "substantial increases in circuity may be compensable." *Id.* ¶ 17, 888 N.W.2d at 227.  It is the circuit court's duty to determine whether the State substantially impaired the landowner's access based on the individual facts of the case.  *State v. Miller*, 2016 S.D. 88, ¶ 43, 889 N.W.2d 141, 154–55 ("The difference [between impairment of access and diversion of traffic or mere circuity of travel] is a matter of degree and depends on the fact pattern in each case.").  "Access rights may be substantially impaired 'even though normal access remains reasonably available . . . where access for which the property *was specifically intended* has been rendered . . . deficient.'" *Id.* ¶ 44, 889 N.W.2d at 156 (citation

modified) (quoting *State v. Dawmar Partners, Ltd.*, 267 S.W.3d 875, 879 (Tex. 2008)).

[¶65.] The majority opinion concludes the circuit court erred in considering the impairment of the highest and best use of the Gustafsons' property in making this determination. This conclusion is misplaced, however, because "the court may consider circumstances such as the nature of the property involved, the character of the access before and after governmental activity, and the location (rural or urban)." *Id.* Further, in determining whether access has been impaired, the court must consider whether "access for which the property was specifically intended [has been] rendered . . . deficient." *Id.* (alteration in original) (quoting *Dawmar*, 267 S.W.3d at 879).

[¶66.] Though access remains available to the Gustafsons' property through the Shirley Avenue entrance off 41st Street, it involves three changes of direction and is over one-half mile away. This is not the access which was "specifically intended."[7] This is evidenced by the Gustafsons' discussions with a national tenant, Chick-fil-A, which notably ceased when it was revealed that the direct 41st Street access would be closing. Moreover, the Gustafsons presented multiple experts who testified about the uniqueness of the parcel and its ability to accommodate high-volume, high density commercial retail businesses because of its short access to 41st Street. Those same experts testified that after the State's project, the property is

---

7. The circuit court found that "[a]fter the project, to access 41st Street from the property, a motorist will be required to drive north on Carolyn Avenue to West 38th Street, turn east towards Shirley Avenue, and then turn south on Shirley Avenue to the intersection with 41st Street. This is the shortest distance to access the property from an arterial street."

now unsuitable for tenants of this kind. After all, the State's project deprived the property of direct access to one of the most-frequently traveled streets in Sioux Falls.[8] This testimony was unrebutted and generally accepted by the circuit court.

[¶67.] But instead of focusing on the plethora of evidence regarding the nature of the property and the character of the access before and after the State's taking, the majority opinion focuses on the circuit court's consideration of the highest and best use of the property. The nature of the property and the character of the access before and after the project are valid considerations supported by *Miller*, and the circuit court properly considered the effect the modification in access would have on the property. Nothing in the record indicates the circuit court conducted an improper analysis of the factors we laid out in *Miller* when determining whether a landowner has suffered a substantial impairment.

[¶68.] In its analysis, the majority opinion then compares the current case to *Schliem*. In *Schliem*, the State's project foreclosed access to plaintiff's property from the west but opened a new access route to the east. 2016 S.D. 90, ¶ 3, 888 N.W.2d at 220. As a result of the project, travelers coming in from the west would have to travel "about 1,100 feet more to reach the Property," but travelers from the east

---

8.    Anyone who has driven down 41st Street during rush hour traffic knows that this is an exceedingly busy street. According to the City of Sioux Falls' traffic counts, the segment of 41st Street directly south of Carolyn Avenue saw an average of 28,600 drivers per day. City of Sioux Falls GIS, *Traffic Counts*, https://dataworks.siouxfalls.gov/datasets/cityofsfgis::traffic-counts/explore?location=43.516199%2C-96.775941%2C15.00 (last visited Dec. 8, 2025) (collecting data from Station ID 290, location between I-29 East Ramps & Mall Drive). The portion of Shirley Avenue which drivers now must use instead of 41st Street, on the other hand, saw an average of 11,000 travelers per day in 2025. *Id.* (collecting data from Station ID 770, location between Shirley Avenue and Louise Avenue).

would travel "about 1,500 feet less to reach the Property." *Id.* ¶ 9, 888 N.W.2d at 222. There was a trade-off in *Schliem*. There is no similar trade-off here. Foreclosure of the 41st Street access requires drivers to make three changes in direction and travel *an additional half mile*, regardless of whether they are driving east or west on 41st Street.

[¶69.]        In *Schliem*, we further concluded that "the physical characteristics of Schliem's access routes before and after the Intersection's closure [were] nearly identical." *Id.* ¶ 18, 888 N.W.2d at 228. The access to the "nearest intersecting highway" increased from 748 feet to 834 feet—a difference of only 86 feet. *Id.* Again, the same cannot be said in this case. The route to access the Gustafsons' property from 41st Street increased from around 200 feet to approximately 3,000 feet, just over one-half mile. The majority opinion measures the change in access as the distance to 38th Street, but this measurement is inaccurate. 38th Street is incomparable to 41st Street and can hardly be considered an "intersecting highway." Far from a "physically identical" access route as was the case in *Schliem*, drivers must now traverse through half a mile of sideroads as opposed to directly accessing the property via 41st Street, an artery to Sioux Falls' commercial district.

[¶70.]        The majority opinion also concludes that the injury the Gustafsons suffered was not peculiar to their property, but was instead of a kind suffered by the public in general. In so concluding, the majority focuses only on the additional distance that the public must now travel to reach the Gustafsons' property, which is admittedly an injury suffered by the public in general. But this analysis focuses on one element of the injury and neglects the fact that the Gustafsons—unlike other

landowners on Carolyn Avenue whose properties did not front 41st Street—were uniquely positioned to accommodate national tenants due to the visibility and access of their property from 41st Street. After the State's project, the property no longer retains its high density, retail character. By focusing on the increase in circuity of travel alone when considering whether this injury is peculiar, the majority overlooks the substantial injury to the character and nature of the property—which is unquestionably unique to the Gustafsons as the only property directly accessible from 41st Street.

[¶71.] Landowner rights matter, especially in South Dakota. This Court has long acknowledged that "South Dakota's Constitution provides greater protection for its citizens than the United States Constitution because 'our Constitution requires that the government compensate a property owner not only when a taking has occurred, but also when private property has been "damaged."'" *Rupert v. City of Rapid City*, 2013 S.D. 13, ¶ 9, 827 N.W.2d 55, 60 (quoting *Krier v. Dell Rapids Twp.*, 2006 S.D. 10, ¶ 21, 709 N.W.2d 841, 846). As we reiterated in *Rupert*, the underlying intent of the damaging clause is to protect individuals from "disproportionately bearing the cost of projects intended to benefit the public generally." *Id.* ¶ 9, 827 N.W.2d at 61 (citation omitted). "The tendency under our system is too often to sacrifice the individual to the community; and it seems very difficult in reason to show why the State should not pay for property which it destroys or impairs the value, as well as for what it physically takes." *Id.* (citation omitted). Today, the Gustafsons, who owned one of the most unique and highly desirable parcels in South Dakota, pay that egregious price. It confounds reason

that the State should not pay the agreed value for the impairment of their access.

In my view, the circuit court did not err in finding the State substantially impaired the Gustafsons' access to 41st Street, and this Court should not disturb its decision. I would affirm the circuit court's order and remand for entry of the stipulated award of $1,329,389, plus interests and costs, for a total of $1,510,901.

[¶72.]    MYREN, Justice, joins this writing.